# Commonwealth *v.* Sanderson, Appellant.

*Contracts—Construction—Subject-matter—Surrounding circumstances—State contract—Public officers—Conspiracy—Criminal law.*

1. The construction of contracts generally involves consideration of the circumstances under which and the subject-matter with regard to which the parties dealt.

2. When the state enters into a contract it must necessarily act through the agency of officers, and it is incumbent not only upon such officers but upon all who deal with them to take notice of their official authority, the limitations thereof and the provisions of the statute under which the officers act.

*Contracts—State contracts—Commissioners of public grounds and Buildings—Act of March 26, 1895, P. L. 22—Conspiracy—Criminal law.*

3. The purpose of the act of March 26, 1895, creating the board of commissioners of public grounds and buildings was to require that the schedules for bidding on state contracts for supplies for state grounds and buildings, should be so prepared that each item of every classification therein contained should make clear what was to be furnished under that particular item.

4. The purpose of the statute as well as of the constitutional provision, was to secure to the state the advantage of competition in the furnishing of all supplies; not merely formal competition, but the presentation to all persons of a fair opportunity to bid upon equal terms; and the competition was to be upon each item of every classification of the schedule.

5. Under the act the award of the contract upon each item of the several classifications of the schedule is in effect a separate contract.

*Contracts—State contract—Construction—Criminal law—Conspiracy.*

6. Where an item in a schedule of a state contract for furniture for the Capitol Building is drawn in terms so general that if it stood alone it might be held to cover almost anything used in the interior furnishing of the building, and other items provide for "designed sofas, seating" and "designed special desks and tables," at a lower price, there is no ambiguity as to the items relating to sofas, seatings, desks and tables, and the determination of the question as to which items cover sofas and tables is for the court and not for the jury. In such a case the contract can only be construed so as to fix the price of sofas and tables at the lower amounts specified in the particular items, rather than the higher amounts specified in the general item.

*Contract — State contracts — Furniture for Capitol — "Per foot" — "Square foot"—"Lineal foot"—Conspiracy—Criminal law—Trade usage.*

7. Where a contract with the state for furnishing specially designed

sofas, desks and tables at a certain price "per foot," does not define the words "per foot," and there is a dispute as to whether the words mean "lineal foot" or "square foot," and it appears that the term "per foot" has no well-defined legal meaning, it is for the jury and not for the court to say what it means under the evidence relating to trade usage.

8. All trades have their usages; and when a contract is made with a man about the business of his craft, it is framed on the basis of its usages which become part of it, except when its place is occupied by particular stipulations. This principle is applicable to obscure and ambiguous expressions relating to the system of measuring applicable in any particular trade or business.

9. Where parties to a contract use a term which has no well-defined meaning, evidence as to the construction which such parties have given to the term under the same or prior contracts, relating to the same subject-matter, is properly admitted and is entitled to consideration.

10. Where a contractor for supplying furniture to the state, claims that the term "per foot" in the contract means "surface foot," evidence is admissible to the effect that under a previous contract containing the same term, he had supplied furniture by the "lineal foot." '

11. Where a contract for supplying furniture to the state is prepared by the state officers, and an expression used therein as to measurements is capable of two meanings, the market value of the articles furnished is admissible in rebuttal to show the falsity of the contractor's claim that he honestly made the charges which he did.

*Criminal law—Conspiracy—State contract—State officers—Public officers—Awarding contract—Evidence.*

12. On the trial of an indictment for conspiracy between state officers, an architect and a contractor for supplying furniture to the State Capitol, to cheat and defraud the state by fraudulent charges and payments, the jury may take into consideration circumstances leading up to the execution of the contract, the language in which the schedule for bidders was prepared, the circumstances accompanying the actual award of the contract, the construction subsequently put upon the various items of the contract by all the defendants and the manner in which they dealt with the bills rendered by the contractor under the contract, and paid out of the money of the state.

*Criminal law—Conspiracy—Statute of limitations.*   .

13. Where in conspiracy an overt act is done within two years, and said act is but one of a series of acts committed by the parties, in pursuance of a common design and to carry out a common purpose, such acts are evidence, provided they tend to show that the last act was a part of a series and the result of an unlawful combination, and such evidence may satisfy a jury of the existence of a conspiracy at the latter period; and this though some of the prior acts may have occurred at a

time when, as an independent conspiracy, it would have been barred by the statute; for the overt acts are the evidence from which a conspiracy may be inferred.

*Criminal law—Conspiracy—State officers—State contract.*

14. Where the officers of the state prepare a schedule for bids for furniture to be supplied to the State Capitol, and thereby invite bids to supply a number of articles of widely different nature of either woodwork, stone, marble, bronze, mosaic, glass and upholstery, at a specified price "per foot," without regard to the great difference in value of the material of which the several articles might possibly be made or the work required to manufacture the same, such acts on their part is evidence to the effect that they acted in collusion with the contractor, that they gave him inside information as to the construction which they would place upon the contract, that in consequence of the vagueness of the terms of the schedule no other person could safely bid, and that in consequence thereof the state was cheated and defrauded. On an indictment for conspiracy against such officers and the contractor, all such matters are for the consideration of the jury.

*Criminal law—Conspiracy—State contract—Architect's certificate—Evidence.*

15. On the trial of an indictment for conspiracy for cheating and defrauding the state in the matter of a contract where the state officers, the contractor and the architect are parties defendant, but the architect has obtained a severance and is not on trial, the commonwealth may, after the evidence of the conspiracy has been introduced, show that the architect furnished false certificates as to the material furnished by the contractor under the contract, and that as an agent of the state he had been disloyal, dishonest and corrupt.

16. When one of several defendants charged with conspiracy secures a severance, and the case goes to trial as to the others, it is competent for the commonwealth to introduce evidence tending to show that any one or more of those on trial had conspired with the defendant who had obtained the severance, the effect of the evidence being limited to the defendants to whom it relates.

*Criminal law—Conspiracy—Parties—Conviction.*

17. The commonwealth is not required on the trial of an indictment for conspiracy to prove that all of the defendants charged are guilty, although it must prove that two or more are guilty.

Argued March 11, 1909. Appeal, No. 12, March T., 1909, by defendant, John H. Sanderson, from judgment of Q. S. Dauphin Co., Sept. T., 1907, No. 239, on verdict of guilty in case of Com-

monwealth v. John H. Sanderson, Joseph M. Huston, James M. Shumaker, William P. Snyder and William L. Mathues. Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ. Affirmed.

Indictment for conspiracy for cheating and defrauding the state. Before KUNKEL, P. J.

The indictment charged John H. Sanderson, as a contractor for the furnishing of the Capitol Building at Harrisburg, sent a false or fraudulent bill or invoice for sofas and tables to the state knowing it to be false and fraudulent; that Joseph M. Huston, architect retained by the board of commissioners of public grounds and buildings, James M. Shumaker, superintendent of public grounds and buildings, William P. Snyder, auditor general of the state, and William L. Mathues, state treasurer, in their respective official capacities, approved and passed this bill or invoice knowing it to be false and fraudulent.

Under the Act of March 26, 1895, P. L. 22, the governor, auditor general and state treasurer, were constituted the board of commissions of public grounds and buildings. This board had under the act entire control and supervision of public grounds and buildings and the furnishing and refurnishing of the buildings. The contract for furnishing the Capitol was awarded to John H. Sanderson on June 7, 1904.

The first count of the indictment after reciting the award of the contract to Sanderson and the duties of the architect and the public officials indicted continued as follows:

"On the said twenty-eighth day of March, in the year of our Lord one thousand nine hundred and six at the County of Dauphin aforesaid, and within the jurisdiction of this Court, with force and arms, etc., did unlawfully, fraudulently, falsely and maliciously conspire, combine, confederate and agree together, between and amongst themselves, and with divers other persons whose names are as yet to the Grand Inquest aforesaid unknown, to unlawfully and fraudulently cheat and defraud the said Commonwealth of Pennsylvania of its moneys, goods, chattels and property, to wit, of the sum of Nineteen Thousand,

warrants down there and the issuing of warrants before any architect's certificate was issued.

Mr. Rothermel: My objection is that this bill had on it a certificate and that certificate was the certificate of the architect. (Discussion.)

Mr. Bergner: Objected to as incompetent, irrelevant, and in no way affecting the defendant Shumaker. With respect to Snyder and Mathues, this proposed testimony is objected to for the reason that it does not propose to show that certificates were not already upon the bills referred to in this letter. It is not proposed to show that these certificates were not duplicate approvals which had not been signed, and does not purport to show that the bills had not already been approved by the architect at the time the warrants proposed in the offer of the commonwealth to be proven by this witness had issued. Further, it is irrelevant, immaterial and inadmissible.

The Court: As we understand, this letter, which purports to be a letter of the defendant Snyder, declares that these two bills had not been approved by the architect.

Mr. Bergner: That the certificates had not been signed.

The Court: That the certificates had not been signed. The letter itself declares that. So far as this offer affects the other defendants, it cannot affect them unless it be shown by an act or circumstances in furtherance of a fabrication or agreement or conspiracy between Snyder and them. The objections are overruled, offer admitted, exceptions to the several defendants.

Mr. Bergner: I desire to add to my objection this on behalf of Snyder: That it being part of the history of this case that all bills presented to the board of public grounds and buildings, or to the auditor general, have duplicate approvals signed by Mr. Huston; that this evidence is immaterial and irrelevant unless it is proposed to show that the bills in question here did not bear the approval of Huston, and further unless it is proposed to show that these two certificates, which it is stated in that letter were not signed, were not duplicate certificates.

The Court: The objections are overruled, offer received.

Exception to the several defendants. [35]

The Court: It is received so far as it affects Snyder, and can-

Three Hundred and Eight Dollars and Forty Cents ($19,308.40) lawful money of the United States of America, by means of a certain false and fraudulent claim, invoice or bill on account of the said contract of the said John H. Sanderson with the said Commonwealth of Pennsylvania, and by means of certain false, fraudulent and collusive certificates to said claim, invoice or bill on account of said contract;

"And in furtherance and execution of said conspiracy, combination, confederation and agreement, the said John H. Sanderson, contractor as aforesaid, falsely, fraudulently and by collusion with the said Joseph M. Huston, James M. Shumaker, William P. Snyder and William L. Mathues, and divers other persons whose names are as yet unknown, then and there prepared and presented for payment, or caused to be prepared and presented for payment, a certain false and fraudulent claim, invoice or bill on account of his said contract, for the total sum of Fifty-three Thousand, Three Hundred and Eighteen Dollars and Sixty Cents ($53,318.60), purporting to be a claim invoice or bill on account of his said contract in manner and form as follows:

\*    \*    \*    \*    \*    \*    \*    \*

"And falsely and fraudulently attached to said bill or invoice an affidavit to the effect that said bill was correct as to feet, quantities and prices, according to contract and plans approved by said board of public grounds and buildings;

"Which said claim, invoice or bill on account of the said contract of the said John H. Sanderson with the said Commonwealth of Pennsylvania for furniture for said new State Capitol Building purporting to have been furnished under Item No. 24 of said Special Schedule of said contract, being the item for 'Decorating and painting, Series F,' at Two Dollars and Fifty-two Cents ($2.52), net, per foot, but charged for under Item No. 22 of said Special Schedule of said contract, being the item for 'Designed Furniture, fittings, furnishings and decorations of either wood-work, stone, marble, bronze, mosaic, glass and upholstery, Series F,' at Eighteen Dollars and Forty Cents ($18.40), net per foot, was false and fraudulent, inter alia, in that the said

| | |
|---|---|
| 65 Special designed sofas, Series F, 1,318½ ft. @ $18.40, net, per ft., . . . . . . . . . . . | $24,260 40 |
| 80 Special designed oblong tables, Series F, 671 ft., @ $18.40, net, per ft., . . . . . . | 12,346 40½ |
| 24 Special designed oval tables, Series F, 246½ ft., @ $18.40, net, per ft., . . . . . | 4,531 00 |
| 50 Special designed round tables, Series F, 198½ ft. @ $18.40, net, per ft., . . . . . . . | 3,652 40 |
| 7 Special designed square tables, Series F, 31 ft., @ $18.40, net, per ft., . . . . . . . . | 570 40 |
| 147 Special designed clothes trees, Series F, 220½ ft. @ $18.40, net, per ft., . . . . . | 4,057 20 |
| in all, . . . . . . . . . . . . . . . . . . . . . | $49,417 80 |

so as aforesaid charged in said claim, invoice or bill on account of said contract as being furnished under said Item No. 22, at said rate of Eighteen Dollars and Forty Cents ($18.40), net, per foot, could not in truth and in fact, be lawfully ordered, furnished, received, certified to or paid for under said Item No. 22, in said Special Schedule of said contract, but could only be lawfully ordered, furnished, charged, received, certified to or paid as follows:

"Said sofas under Item No. 25 in said Special Schedule of said contract, being the item for 'Designed sofas, seating, etc., either upholstered wood, metal or stone, Series F,' at twelve Dollars and Ninety Cents ($12.90), net, per foot;

"Said oblong tables, oval tables, round tables and square tables under Item No. 27 of said Special Schedule of said contract, being the item for 'Designed Special Desks and Tables, Series F,' at Ten Dollars and Eighty Cents ($10.80), net, per foot;

"Said clothes trees under Item No. 4 of said Special Schedule of said contract, being the item for 'Clothes trees (Mahogany),' at Five Dollars and Fifty-five Cents ($5.55), net, each, under which said items said furniture, if the same contained the number of feet set forth in said claim, invoice or bill on account, could, in no event, be billed at more than the following amounts:

| | | |
|---|---|---:|
| 65 | Special designed sofas, Series F,......... | $17,008 65 |
| 80 | Special designed oblong tables, Series F,. | 7,246 80 |
| 24 | Special designed oval tables, Series F,.. | 2,659 50 |
| 50 | Special designed round tables, Series F,.. | 2,143 80 |
| 7 | Special designed square tables, Series F,.. | 334 80 |
| 147 | Special designed clothes trees,......... | 715 85 |
| | in all,.................... | $30,109 40 |

or Nineteen Thousand, Three Hundred and Eight Dollars and Forty Cents ($19,308.40) less than the amount at which said articles of furniture were so, as aforesaid, falsely and fraudulently billed; but in truth and in fact said sofas, oblong tables, oval tables, round tables, square tables and clothes trees did not contain Two Thousand, Six Hundred and Eighty-five and Three-fourths (2,685¾) feet, as set forth in said claim, invoice or bill on account; the said John H. Sanderson then and there well knowing that the said claim, invoice or bill on account of his said contract was false and fraudulent;

"And thereupon the said Joseph M. Huston, Architect and Agent, as aforesaid, employed and appointed as aforesaid by the said Board of Commissioners of Public Grounds and Buildings of the said Commonwealth of Pennsylvania, falsely, fraudulently and by collusion with the said John H. Sanderson, James M. Shumaker, William P. Snyder and William L. Mathues, and other persons whose names are as yet unknown, then and there approved said fraudulent bill, then and there well knowing that the same was false and fraudulent, and fraudulently certified that the said John H. Sanderson was entitled to payment for, inter alia, the sum of Forty-nine Thousand, Four Hundred and Seventeen Dollars and Eighty Cents ($49,417.80), for furnishing said above described furniture, under said Item No. 24, whereas, in truth and in fact, the said John H. Sanderson was not entitled to payment of said sum of Forty-nine Thousand, Four Hundred and Seventeen Dollars and Eighty Cents ($49,417.80);

"And thereupon, the said James M. Shumaker, Superintendent of Public Grounds and Buildings of the said Commonwealth of Pennsylvania, as aforesaid, falsely, fraudulently and

by collusion with the said John H. Sanderson, Joseph M. Huston, William P. Snyder, and William L. Mathues, and other persons whose names are as yet unknown, certified, inter alia, that the said fraudulent claim, invoice or bill on account of said contract was correct and true, that the quantities and prices therein mentioned were correct and according to contract and plans approved by the said Board of Commissioners of Public Grounds and Buildings, whereas, in truth and in fact, the said claim, invoice or bill on account of said contract was not correct and true, and the quantities and prices therein specified were not correct and according to contract and plans approved by said Board of Commissioners of Public Grounds and Buildings, the said James M. Shumaker then and there well knowing that the said claim, invoice or bill on account of said contract was not correct and true, and that the quantities and prices therein specified were not correct and according to contract and plans approved by the said Board of Commissioners of Public Grounds and Buildings, and he, the said James M. Shumaker, Superintendent of Public Grounds and Buildings, as aforesaid, thereupon, falsely, fraudulently and by collusion with the said William P. Snyder and William L. Mathues, then and there members of said Board of Commissioners of Public Grounds and Buildings, presented said false and fraudulent claim, invoice or bill on account of said contract to the said Board of Commissioners of Public Grounds and Buildings, and falsely and fraudulently secured the approval of said Board thereto;

"Whereupon, the said false and fraudulent claim, invoice or bill on account of said contract covering, inter alia, the said items for Forty-nine Thousand, Four Hundred and Seventeen Dollars and Eighty Cents ($49,417.80), for said furniture, having been presented to the said William P. Snyder, Auditor General of the said Commonwealth of Pennsylvania, as aforesaid, he, the said William P. Snyder, his duty in the premises wholly disregarding, and without having audited, examined and adjusted said false and fraudulent claim, invoice or bill on account of said contract, did falsely, fraudulently and by collusion with the said John H. Sanderson, Joseph M. Huston,

James M. Shumaker and William L. Mathues, and other persons whose names are as yet unknown, sign and settle said false and fraudulent claim, invoice or bill on account of said contract, and submit the same to the said William L. Mathues, State Treasurer as aforesaid, for his approval, he, the said William P. Snyder, then and there well knowing the said claim, invoice or bill on account of said contract and the said approval and certificates to be false and fraudulent;

"Whereupon the said William L. Mathues, State Treasurer as aforesaid, his duty in the premises wholly disregarding, and without examining and revising the same, did falsely, fraudulently and by collusion with the said John H. Sanderson, Joseph M. Huston, James M. Shumaker, and William P. Snyder, and other persons whose names are as yet unknown, by E. C. Dewey, his Assistant Cashier, then and there acting under the authority and direction of him, the said William L. Mathues, approve the same, he, the said William L. Mathues, State Treasurer as aforesaid, then and there well knowing the said claim, invoice or bill on account of said contract, and the said approval and certificates to be false and fraudulent;

"Whereupon the said William P. Snyder, Auditor General of the said Commonwealth of Pennsylvania, as aforesaid, then and there well knowing that the said claim, invoice or bill on account of said contract was false and fraudulent, did, unlawfully, falsely, fraudulently, and by collusion with the said John H. Sanderson, Joseph M. Huston, James M. Shumaker, and William L. Mathues, and other persons whose names are as yet unknown, draw a warrant upon the said State Treasurer of the said Commonwealth of Pennsylvania, under date of April 13, 1906, being Warrant No. 13,209, in full payment of said false and fraudulent claim, invoice or bill on account of said contract, directing the said State Treasurer to pay to the said John H. Sanderson, or his order, the sum of Fifty-three Thousand, Three Hundred and Eighteen Dollars and Sixty Cents ($53,318.60), said warrant being in full payment, inter alia, for the said furniture, he, the said William P. Snyder, Auditor General as aforesaid, then and there knowingly, falsely and fraudulently certifying that the said false and fraudulent account for

the same had been settled agreeably to law; which said warrant the said William L. Mathues, State Treasurer as aforesaid, falsely, fraudulently and by collusion with the said John H. Sanderson, Joseph M. Huston, James M. Shumaker and William P. Snyder, and other persons whose names are as yet unknown, honored, and paid the amount thereof to the said John H. Sanderson, or his order, then and there well knowing that the said warrant was in payment of a false and fraudulent claim, invoice or bill on account of said contract.

"Whereby, the said Commonwealth of Pennsylvania was cheated and defrauded, as aforesaid, of the sum of Nineteen Thousand, Three Hundred and Eight Dollars and Forty Cents ($19,308.40), then and there the property of the said Commonwealth of Pennsylvania, contrary to the form of the Act of the General Assembly in such case made and provided, and against the peace and dignity of the Commonwealth of Pennsylvania."

The second count was similar in its averments to the first, but concluded as follows:

"Whereby, The Commonwealth of Pennsylvania and the people thereof were cheated and defrauded, as aforesaid, of the sum of Nineteen Thousand, Three Hundred and Eight Dollars and Forty Cents ($19,308.40), then and there the property of the said Commonwealth of Pennsylvania and the people thereof, to the great damage of the said Commonwealth of Pennsylvania and the people thereof, and to the evil example of all others in like cases offending, and against the peace and dignity of the Commonwealth of Pennsylvania."

At the trial the commonwealth made this offer:

Mr. Cunningham: The commonwealth proposes to prove by the witness upon the stand that prior to June or July, 1905, the architect issued a general form of architect's certificate without specifying item numbers, measurements or weights; that having received the instructions testified to by the witness upon the stand subsequent to that time, he filled in from the bill of the defendant, John H. Sanderson, the item number and al-

leged measurements of the furniture; that this was done without any attempt upon the part of the architect to verify either item numbers or measurements, but simply in accordance with the instructions of the auditor general to the end as stated by the auditor general that he might identify the certificate with the bill in question. This testimony is offered in connection with the testimony as to the adoption of the resolution of January 10, 1905, by the board of public grounds and buildings directing that payments should be made in part or fully on account of this contract upon the certificate of the architect alone, for the purpose of showing that the auditor general undertook to prescribe to the architect the form those certificates should take and knowing that the architect did not undertake to certify in any way either as to the correctness of the item or measurements in the bill.

Mr. Rothermel: That doesn't show the conspiracy alleged in the indictment and has no bearing on it. (Discussion.)

Mr. Cunningham: If the court please, adopting the suggestion as to the better order of proof, we ask leave to withdraw the witness for the present. As I recall it, we were inquiring of you last week relative to the matter of an alleged change in the form of the certificate of the architect attached to the bills of Mr. Sanderson, under the special furniture schedule. Do you recall what was asked you about that matter?

Mr. Lewis: Yes, sir.

Mr. Cunningham: I propose to pursue that inquiry now. The proposition of the commonwealth, as I recall it, was to show that about the middle of the year 1905, the auditor general, Mr. Snyder, requested the architect to change the form of his certificate. Objection was made at that time upon the ground that the commonwealth had not established the falsity of the bill upon which the indictment was based, to such an extent as to admit acts of defendants. Having established that, as we contend, we now propose to pursue the inquiry that was abandoned at that time because the objection was sustained by the court.

Mr. Rothermel: I raise the same objection that I made before.

Mr. Cunningham: The offer is to prove by the witness on the stand that prior to July, 1905, architect's certificates were issued in the ordinary form of an architect's certificate simply without setting forth in the certificate itself either item numbers or weights or measurements of the articles mentioned in the invoice to which certificates were attached; that about July, 1905, Auditor General Snyder requested the witness to insert in subsequent architect's certificates the item number and weights and measurements of the articles mentioned in the invoice and instructed the witness to copy said item numbers, weights and measurements from the footings of the invoices, stating that he desired such information for the purpose of identifying the architect's certificates with the bills, in order to enable him to check up in his office.

This offer is made for the purpose of showing that Auditor General Snyder knew that architect's certificates issued subsequent to that time did not purport to be a certificate of the architect; that the item numbers, weights or measurements in the invoices to which the same were attached were correct, but that said certificates were mere transcripts from the footings of the invoices themselves; to show that he was in duty bound with that knowledge to make his own investigations of the correctness of this bill and could not rely upon the architect's certificates inasmuch as he dictated the form of that certificate and how it should be made up by merely copying from the bill.

Mr. Scarlet: Also for the purpose of showing fabrication of evidence upon the part of Mr. Snyder as to the architect's certificate in question.

Mr. Bergner: We object to this offer for the reason that it does not prove or tend to prove the purpose for which it is offered, and for the further reason that it is not proposed to show that Auditor General Snyder ever ordered Mr. Lewis or Mr. Huston or anyone associated with him not to measure or weigh.

Mr. Gilbert: For the further reason that the offer is not only inconsistent with but plainly contradicted by the testimony, both oral and written, which the commonwealth has already submitted in this case, and for the further reason that it is incompetent, irrelevant, immaterial and inadmissible.

Mr. Rothermel: I object on the ground stated by the other counsel and also on the ground of irrelevancy.

Mr. Cunningham: I propose to prove also by this witness on the stand that Auditor General Snyder prescribed in writing the form in which the architect's pink certificate should be made at or about the middle of the year 1905. (Discussion.)

Mr. Bergner: We object because there is nothing here to show that he did know the architect's certificates were not correct, and because it is not offered to show that he directed the certificate to be made without measuring and without weighing. (Discussion.)

The Court: We think the evidence is admissible. The question of its weight is for the jury. Whether it has any weight or not, they will have to say. The objections are overruled. The offer is admitted and exceptions noted to the several defendants.

Exceptions to defendants. [34]

Mr. Cunningham: The commonwealth now proposes to prove by the witness on the stand that about April, 1906, Auditor General Snyder notified Huston, the architect, that two certificates on bills approved April 10, 1906, were not signed; that he, Mr. Snyder, would bring them to Philadelphia and would be at No. 900 Arcade Building to get the architect's signature to said certificates; that as a matter of fact, the auditor general subsequent to said notification, which notification was made by letter, brought two warrants to Philadelphia drawn on bills for which no architect's certificate had been issued and requested the witness and architect Huston to bring architect's certificates for those warrants over to No. 900 Arcade Building, Philadelphia; that in pursuance of this request the witness and architect Huston went over to Room 900 Arcade building, where two architect's certificates were issued corresponding in amount to amounts of the said warrants. This is offered for the purpose of showing that warrants were drawn before any architect's certificates were issued and that architect's certificates were issued corresponding in amount to those warrants at the request of the auditor general for the purpose of showing the knowledge upon

the part of the auditor general that said architect's certificates did not purport to be certificates as to the correctness of the invoices upon which the warrants had been prepared, and showing the irregular course of issuing the warrants.

Mr. Rothermel: Which architect's certificates?

Mr. Cunningham: These two that I am talking about in the offer.

Mr. Rothermel: I fail to see that that proves it, fail to see that a desire to have an additional certificate to the certificate already on the bill is any evidence that the second certificate did not amount to anything, or that he understood it didn't amount to anything. Upon what theory is that offered? It shows extraordinary care upon the part of the auditor general that he desired to have a particular form of certificate. Upon what theory can the conclusion be drawn that the commonwealth asks for from the evidence of that character?

Mr. Schaffer: I do not represent the particular defendant that this is intended to connect by, but an examination of the latter will show that the certificates were attached, and the only thing that was required was the signature. Instead of substantiating the offer made it only indicates that there had been an inadvertent omission to sign the certificate which was already there.

Mr. Cunningham: But, Mr. Schaffer, the offer is to show that the letter is not true; as a matter of fact, there had been no certificates issued.

The Court: What letter are you speaking of now?

Mr. Cunningham: The letter of Auditor General Snyder.

The Court: That is not in the case yet.

Mr. Cunningham: I propose to show that the notice was given by letter.

Mr. Rothermel: Do you mean to state that the bills did not have the black certificate on them?

Mr. Cunningham: I cannot state that positively, whether they had or not.

Mr. Rothermel: I think that is very important.

Mr. Bergner: It is dated in 1906.

Mr. Cunningham: I cannot state that positively because I don't know. The purpose is to show the carrying of those

Three Hundred and Eight Dollars and Forty Cents ($19,308.40) lawful money of the United States of America, by means of a certain false and fraudulent claim, invoice or bill on account of the said contract of the said John H. Sanderson with the said Commonwealth of Pennsylvania, and by means of certain false, fraudulent and collusive certificates to said claim, invoice or bill on account of said contract;

"And in furtherance and execution of said conspiracy, combination, confederation and agreement, the said John H. Sanderson, contractor as aforesaid, falsely, fraudulently and by collusion with the said Joseph M. Huston, James M. Shumaker, William P. Snyder and William L. Mathues, and divers other persons whose names are as yet unknown, then and there prepared and presented for payment, or caused to be prepared and presented for payment, a certain false and fraudulent claim, invoice or bill on account of his said contract, for the total sum of Fifty-three Thousand, Three Hundred and Eighteen Dollars and Sixty Cents ($53,318.60), purporting to be a claim invoice or bill on account of his said contract in manner and form as follows:

\*    \*    \*    \*    \*    \*    \*    \*

"And falsely and fraudulently attached to said bill or invoice an affidavit to the effect that said bill was correct as to feet, quantities and prices, according to contract and plans approved by said board of public grounds and buildings;

"Which said claim, invoice or bill on account of the said contract of the said John H. Sanderson with the said Commonwealth of Pennsylvania for furniture for said new State Capitol Building purporting to have been furnished under Item No. 24 of said Special Schedule of said contract, being the item for 'Decorating and painting, Series F,' at Two Dollars and Fifty-two Cents ($2.52), net, per foot, but charged for under Item No. 22 of said Special Schedule of said contract, being the item for 'Designed Furniture, fittings, furnishings and decorations of either wood-work, stone, marble, bronze, mosaic, glass and upholstery, Series F,' at Eighteen Dollars and Forty Cents ($18.40), net per foot, was false and fraudulent, inter alia, in that the said

warrants down there and the issuing of warrants before any architect's certificate was issued.

Mr. Rothermel: My objection is that this bill had on it a certificate and that certificate was the certificate of the architect. (Discussion.)

Mr. Bergner: Objected to as incompetent, irrelevant, and in no way affecting the defendant Shumaker. With respect to Snyder and Mathues, this proposed testimony is objected to for the reason that it does not propose to show that certificates were not already upon the bills referred to in this letter. It is not proposed to show that these certificates were not duplicate approvals which had not been signed, and does not purport to show that the bills had not already been approved by the architect at the time the warrants proposed in the offer of the commonwealth to be proven by this witness had issued. Further, it is irrelevant, immaterial and inadmissible.

The Court: As we understand, this letter, which purports to be a letter of the defendant Snyder, declares that these two bills had not been approved by the architect.

Mr. Bergner: That the certificates had not been signed.

The Court: That the certificates had not been signed. The letter itself declares that. So far as this offer affects the other defendants, it cannot affect them unless it be shown by an act or circumstances in furtherance of a fabrication or agreement or conspiracy between Snyder and them. The objections are overruled, offer admitted, exceptions to the several defendants.

Mr. Bergner: I desire to add to my objection this on behalf of Snyder: That it being part of the history of this case that all bills presented to the board of public grounds and buildings, or to the auditor general, have duplicate approvals signed by Mr. Huston; that this evidence is immaterial and irrelevant unless it is proposed to show that the bills in question here did not bear the approval of Huston, and further unless it is proposed to show that these two certificates, which it is stated in that letter were not signed, were not duplicate certificates.

The Court: The objections are overruled, offer received.

Exception to the several defendants. [35]

The Court: It is received so far as it affects Snyder, and can-

not affect the other defendants unless it should be found to have been done in furtherance of an agreement or conspiracy between Snyder and the others.

Mr. Cunningham: The offer is to prove by the witness on the stand that prior to July, 1905, architect's certificates were issued in the ordinary form of an architect's certificate simply without setting forth in the certificate itself either item numbers or weights or measurements of the articles mentioned in the invoice to which certificates were attached; that about July, 1905, Auditor General Snyder requested the witness to insert in subsequent architect's certificates the item numbers and weights and measurements of the articles mentioned in the invoice and instructed the witness to copy said item numbers, weights and measurements from the footings of the invoices, stating that he desired such information for the purpose of identifying the architect's certificates with the bills, in order to enable him to check up in his office. This offer is made for the purpose of showing that Auditor General Snyder knew that architect's certificates issued subsequent to that time did not purport to be a certificate of the architect; that the item numbers, weights or measurements in the invoice to which the same were attached were correct, but that said certificates were mere transcripts from the footings of the invoices themselves; to show that he was in duty bound with that knowledge to make his own investigations of the correctness of this bill and could not rely upon the architect's certificates inasmuch as he dictated the form of that certificate and how it should be made up by merely copying from the bill.

Objection overruled. Exception. [37]

The evidence given under this assignment of error was the same as that given under the thirty-fifth assignment of error.

" Q. Commonwealth's exhibit No. 128 shown witness. I will ask you whether or not that is the book referred to in the letter and sent along with the letter? A. It is."

Mr. Cunningham: The purpose is to show the contract made by the board and the architect, Joseph M. Huston. The pur-

pose is to show that it was not his duty to certify as to the correctness of measurements or weights, and that the defendants, Snyder and Mathues, being the successors of the members of the board who made this contract with Huston, were bound to take notice of the contract with Huston and cannot now contend that they had a right to rely upon the certificates of the architect as to weights and measures.    (Discussion.)

Mr. Scarlet: The purpose of the offer is also to corroborate the witness.

Mr. Rothermel: I think on reflection I will withdraw my objection.

The Court: The objection having been withdrawn, the offer is received.

Mr. Schaffer: On behalf of Mr. Mathues and Mr. Snyder we object to this testimony as incompetent, irrelevant and immaterial.    They were not members of the board at the time this contract was entered into, and this being a criminal proceeding, what they knew and what they ought to have known are radically different things.    Further, if it pleases the court, it occurs to me that that book, read into this contract, shows that his duties were more than is here set up.

The Court: We understand this testimony is offered to corroborate the witness as to his testimony delivered last week, wherein he stated that neither he nor his associate, Huston, were responsible for weights or measurements, so far as it may corroborate that testimony.    The objection is overruled, offer admitted and exceptions granted to Snyder, Mathues and Shumaker.

Exceptions to defendants Snyder, Mathues and Shumaker. [38]

John C. Delaney called on behalf of the commonwealth, duly sworn; direct examination by Mr. Cunningham:

Mr. Cunningham: This witness is called for the purpose of identifying his signature to the certified schedule of 1898–99, filed in the auditor general's department under the act of 1895. Inasmuch as the special furniture schedule of 1904–05, upon which the contract in question in this case was awarded to John

H. Sanderson, one of the defendants, by the commonwealth of Pennsylvania, through its proper officers, contains the following item, designated as item No. 25: "Designed sofas, seating, etc., either upholstered, wood, metal or stone, Series F, per foot $15–14%," or $12.90 net, per foot, but is ambiguous in so far as said item for sofas is concerned in that it is not specified whether the phrase "per foot" is used to describe linear feet, square feet, or cubic feet, or any specified method of measurement, the commonwealth now proposes to prove that the signed schedule for the years 1898 and 1899, at page 37 thereof, contained the following item designated as item No. 7, thereof, "leather covered sofas (mahogany West Indian) per foot $35–38% off," or $21.70 net, per foot, that the contract was duly awarded on said item in said schedule by the proper officers of the commonwealth of Pennsylvania to the said John H. Sanderson to furnish sofas under said item for the current year at his said bid of thirty-eight per cent. off the maximum price of $35.00 per foot; that the said John H. Sanderson in the performance of said contract, furnished and billed under date of April 29, 1899, a certain sofa for the department of agriculture under the following description in the invoice therefor: "One leather sofa, 6 ft. 9 long, $35 per foot–38%, $146.47," and that under said date of April 29, 1899, the said John H. Sanderson furnished and billed to the said commonwealth of Pennsylvania for the room of the speaker of the house a certain other sofa described and designated in the invoice therefor as follows: "One leather covered sofa, 6 ft. 6, $35 per foot–38%, $141.05," and that the said John H. Sanderson furnished and billed under the said date of April 29, 1899, to the commonwealth of Pennsylvania, for the department of the lieutenant governor, a certain other sofa designated and described in the invoice therefor as follows: "One sofa 6 ft. 6 inches, $35–38%–$21.70, $141.05;" and that the said John H. Sanderson furnished and invoiced under said date of April 29, 1899, to the commonwealth of Pennsylvania and for the department of the auditor general a certain other piece of furniture designated and described in the invoice therefor as follows: "One drophead lounge 6 ft. 6 inches, $35–38%–$21.70, $141.05;" and that the said John H. San-

derson in the performance of said contract also furnished and billed under said date of April 20, 1899, two sofas for the executive mansion under the following description in the invoices therefor: "Two 5 ft. white enamel and bronze sofas, $35 per foot–38%–$217," and that the said John H. Sanderson, under said date of April 29, 1899, furnished and billed another article of furniture described in the invoice therefor as follows: "One oak drop arm couch, 6 feet, 6 inches, $35 per foot–38%–$21.70 —$141.05," and that the said John H. Sanderson collected from the said commonwealth of Pennsylvania the above mentioned sums of money for said sofas at the rate as aforesaid of $21.40 not for each linear or running foot in the length of said sofas.

The commonwealth offers to prove these facts for the purpose of showing the construction and interpretation heretofore placed by the said John H. Sanderson and by the commonwealth of Pennsylvania, acting through its proper officers, upon the phrase "per foot" in so far as the use of said phrase is concerned in the manner of the furnishings of sofas by the said John H. Sanderson to the said commonwealth of Pennsylvania upon a contract to furnish the same at a stipulated price "per foot," and for the further purpose of establishing the standard and method of measurement by which the correctness or falsity of the measurement of sofas, given in the invoice, upon which the indictment in this case is based, are to be tested and decided, and for the further purpose of showing the practice and course of dealing of the parties under a prior contract for the purchase and sale of sofas at a specified price "per foot." (Argument.)

Mr. Rothermel: I object to the offer as irrelevant.

The Court: The objection is overruled, and the offer is received so far as it may affect the defendant Sanderson alone. Exception for the defendant. [39]

Mr. Hensel: May it please the court, on page 461 of the notes of testimony the commonwealth offered in evidence the certified schedule of 1898–99, being commonwealth's exhibit No. 88, particularly the pages marked 89 and 90, followed by the identification of the book by witnesses Cameron, Stott and Kroehl; and subsequently, on page 469 of the notes of testimony, the

commonwealth renewed the offer (commonwealth's exhibit No. 88); and subsequently the court admitted the certified schedule of 1898–99, particularly page 37 thereof, being commonwealth's exhibit No. 89; followed by certain warrants to John H. Sanderson and paid to him under the contract to furnish sofas under said furniture schedule. Counsel for John H. Sanderson moved to strike out of said testimony and to withdraw from the jury said exhibit No. 89 and the warrants, upon the ground that an examination of such schedule showed:

1. That the sofas—the first two in item No. 7 of said schedule—were leather covered sofas, mahogany, West Indian; and further, that all the furniture comprehended in the said schedule and upon which bids were received and the contract awarded, were "as per designs and specifications submitted;" and that the exhibit of the commonwealth, No. 89, did not contain and were not accompanied by any designs and specifications.

The Court: Motion is overruled, exception to the defendant Sanderson. [45]

Mr. Cunningham: The former offer is withdrawn, and the commonwealth now proposes to prove by the witness on the stand that Joseph M. Huston, architect, when about to depart upon a trip to Europe, left with the witness, who was in his office in a clerical capacity, a number of signed architect's certificates, leaving the body of certificates blank, and simply signing his name on the line followed by the word "Architect." During the absence of Joseph M. Huston in Europe, John H. Sanderson, one of the defendants now on trial, came to the office of Joseph M. Huston in Philadelphia, where the witness was employed, presented the bill that has been offered and received in evidence as commonwealth's exhibit No. 46, and requested an architect's certificate upon that bill; that the witness informed John H. Sanderson that his brother was in Europe, that Sanderson insisted upon obtaining the certificate, stating in substance that if there was anything wrong with the bill it would be checked up by the superintendent of public grounds and buildings and by the auditor general before any payments

were made on account of the bill. Thereupon the witness took one of the blank certificates left in his possession, being the certificate offered and received in evidence as commonwealth's exhibit No. 44, and filled out the body of said certificate, using as his guide in filling the same out the last line upon the bill on the invoice, reading: "Item 24, 2,897¾ feet at $20, less 8 per cent., equals $18.40, total $53,318.60."

The Court: What is the purpose?

Mr. Cunningham: The purpose is to show that John H. Sanderson, one of the defendants now on trial, procured from this witness, in the absence of the architect, the certificate that has been admitted in evidence; that said certificate was given without any examination upon the part of the witness, or Joseph M. Huston, of the correctness of the bill either as to item numbers, or terms therein, and that it was obtained upon the assurance by the defendant that if there were any errors in the bill they would be checked up by the superintendent of public grounds and buildings.

The Court: What is the purpose? What conclusion do you draw from the proof which you now offer to present?

Mr. Cunningham: That it is evidence of conspiracy or of collusion.

The Court: That the signature was obtained by Sanderson?

Mr. Cunningham: The certificate was obtained by Sanderson upon the representation that the bill would be corrected by state officers if there was anything wrong with it.

Mr. Rothermel: My objection is it is not competent to prove that at this time. Until it is shown there was an executed conspiracy in the manner and form as stated in the indictment, all this evidence would be irrelevant. The procuring of an honest certificate would not be wrong in any particular, and if the bill was right an honest certificate could not possibly be evidence of any kind.

The Court: It amounts to nothing if the bill is not fraudulent.

Mr. Gilbert: I would like to offer an objection on behalf of Messrs. Snyder and Mathues. I object to the admission of this testimony on the ground that it is irrelevant, incompetent and inadmissible.

Mr. Bergner: On behalf of James M. Shumaker, we offer the objection that the proposed testimony is immaterial, irrelevant, inadmissible, incompetent, and that there is no offer to prove that James M. Shumaker was in any way connected with or had knowledge of the matters set forth in the offer of the commonwealth.

The Court: Of course, the evidence offered cannot affect the defendants Mathues, Snyder and Shumaker, unless it be shown that it was in furtherance of a conspiracy—unless a confederation of agreement be shown between Sanderson and the other defendants. But we think it is competent as against Sanderson. The objection is, therefore, overruled, and the offer admitted, and exceptions allowed to the several defendants. [52]

Defendant presented these points:

1. That by the terms of the contract entered into between the board of commissioners of public grounds and buildings and John H. Sanderson, John H. Sanderson had the right to charge—for the articles furnished under the invoice alleged to be false and fraudulent in the indictment—under item 22 of the schedule.  *Answer:* Refused. [1]

2. That by the terms of the contract entered into between the board of commissioners of public grounds and buildings and John H. Sanderson, John H. Sanderson had the right to charge—for the articles furnished under the invoice alleged to be false and fraudulent in the indictment—by the surface foot of finished surface.  *Answer:* Refused. [2]

3. That by the terms of the contract entered into between the board of commissioners of public grounds and buildings and John H. Sanderson, John H. Sanderson had the right to charge—for the articles furnished under the invoice alleged to be false and fraudulent in the indictment—by the surface foot of finished surface under item 22 at $18.40 for each foot of finished surface.  *Answer:* Refused. [3]

4. That there is no evidence in the case tending to show that there was fraud or collusion in the awarding of the contract; and that John H. Sanderson was entitled to receive from the state the prices for which he contracted to furnish the goods,

whether the prices at which the goods were charged by Sanderson and paid for by the state were very high or not. *Answer:* Refused. [4]

5. That the value of the goods furnished by Sanderson to the state and paid for by it, cannot be taken into consideration by the jury in determining the guilt or innocence of any of the defendants of the charges contained in the indictment. *Answer:* Refused.

This must be refused. However, we say that the value of the goods is only to be considered by the jury upon the question whether the term "per foot" used in the schedule was intended to mean square or surface foot as claimed by the defendant Sanderson. As to him only is it to be considered, not as to the other defendants, whom we do not understand now make such claim as a defense. [5]

10. That under the evidence, the jury must find a verdict of "not guilty" as to all the defendants. *Answer:* Refused. [6]

11. That under the evidence, the jury must find a verdict of "not guilty" as to John H. Sanderson. *Answer:* Refused. [7]

14. That if the jury believes that the contract, evidenced by the schedule, plans and specifications, under which Sanderson bid and under which the contract was awarded to him, was, in using the term "per foot" ambiguous and that the term might with equal propriety be applied to two or more systems of foot measurement, Sanderson, the contractor, would have the right to select that measurement which he might regard as serving him best. *Answer:* This we say is true if such selection did not result in an unconscionable, extortionate, and unjust charge. [8]

20. The only item in the schedule which was therein expressly prescribed to be furnished by the lineal foot was item 1, covering bookcases and wardrobes; and it was not prescribed in the schedule that any designed furniture should be measured and paid for by the lineal foot. *Answer:* It is not prescribed in terms in the schedule that any designed furniture should be measured by the lineal foot, but the term used in the schedule is "per foot." What that means is for the jury to determine so far as it is necessary to do so to enable it to ascertain whether or not the bills offered in evidence were false or not. [9]

22. The contractor, Sanderson, one of the defendants, had a contract to furnish designed furniture, and other fittings, furnishings and decorations, at an average or unit price, "per foot." If at the time he made the contract he understood, and the members of the board of public grounds and buildings and their architect, representing the state, understood this to mean per square surface foot, and if he was instructed by the architect and advised by the board of public grounds and buildings that it meant per square or surface foot, and if acting upon that understanding and instruction he charged and was paid per square foot, such charge was not fraudulent and the fact that in certain bills he reduced his charges below the maximum he might have legally charged, is in itself no evidence of fraud. *Answer:* This is affirmed, but the jury are to take into consideration the fact that he charged less than he claims now he had a right to charge, in determining the honesty of his belief that the term "per foot" meant square foot. [10]

The court charged in part as follows:

[The commonwealth contends that the sofas and the tables for which the bill in the present case was rendered were properly chargeable, the sofas under item 25, and the tables under item 27, and not under item 22, under which they were billed. The question, therefore, arises upon the construction of this schedule and contract. Are designed sofas properly chargeable under item 22, or should they be charged under item 25? Are designed tables properly chargeable under item 22, or should they be charged under item 27? Now this has been submitted to us by the defense as a question of law. The construction of writings is usually for the consideration of the court. We, therefore, say to you that we think the proper construction of this schedule and contract under which sofas and tables were furnished in this bill in the indictment by the defendant Sanderson were incorrectly charged under item 22, that the sofas ought to have been charged under item 25, and the tables were properly chargeable under item 27. In this respect this bill, this invoice, is false.] [11]

[It may be observed that the construction which we are asked

to place upon this schedule by counsel for the defendants, namely, to construe it so as to permit the contractor Sanderson to charge for sofas and tables under item 22 would substantially and practically nullify the very purpose which this contract was intended to accomplish.] [12]

[It may be observed that the construction which we are asked to place upon this schedule by counsel for the defendants, namely, to construe it so as to permit the contractor, Sanderson, to charge for sofas and tables under item 22 would substantially and practically nullify the very purpose which this contract was intended to accomplish. The constitutional provisions which the act of 1895 was intended to carry into effect, and the act of 1895 which provides for the letting of contracts for the furnishing of supplies to the state by the board of public grounds and buildings, and the contract let by virtue of the authority contained in the act of 1895, evidently were intended to secure to the state a fixed and certain price for the articles which she contracted to purchase, and the lowest price; and it is a familiar rule of construction that a writing or an agreement should be construed to carry into effect its purpose. Therefore we say to you inasmuch as it was intended by the contract entered into between the state and the defendant contractor for supplies to be furnished to secure to the state a fixed and certain price for the articles purchased, and the lowest price, that this contract should be, construed to carry out and effect that purpose, and that the construction we have placed upon it, we think, is consonant with the purpose for which the contract was made.] [13]

[To permit a contractor to exercise the option of supplying under his contract to the state articles at one price, at a higher price, or at a lower price, as would be the case if we acceded to the contention of the defense as to the construction of this contract, would, as we say, practically nullify the purpose for which the contract was made.] [14]

[Besides, we do not think there is any ambiguity in this contract with respect to the item number under which sofas or tables should be furnished. Item 25 expressly declares for designed sofas, seating, etc. Item 27 expressly declares for de-

signed special tables.  So we think it would be a violation of the language of the contract to say where the item specifically provided for an article, naming it, that it should be billed under an item which declares for designed furniture.  Where the specific article is named, we think the article should be billed under the item naming it, and not under the general term which might include it.  Therefore, we say, gentlemen of the jury, that so far as this bill contained in this indictment is concerned, it is false in that the charge for sofas and for tables are improperly made under item 22 of the schedule.] [15]

[Besides, we do not think there is any ambiguity in this contract with respect to the item number under which sofas or tables should be furnished.  Item 25 expressly declares for designed sofas, seating, etc.  Item 27 expressly declares for designed special tables.  So we think it would be a violation of the language of the contract to say where the item specifically provided for an article, naming it, that it should be billed under an item which declares for designed furniture.] [16]

[Where the specific article is named, we think the article should be billed under the item naming it, and not under the general term which might include it.  Therefore, we say, gentlemen of the jury, that so far as this bill contained in this indictment is concerned, it is false in that the charges for sofas and for tables are improperly made under item 22 of the schedule.] [17]

[If these clothes trees are designed clothes trees we say it may be that they are properly billed and charged for under item 22, but it is of no special consequence for the purposes of this case, because if you find that the bill is false in item numbers as to any of the articles of furniture, it is sufficient.] [18]

[The commonwealth also charges that this bill is false in measurements, that the measurements set opposite the articles in the bill are false.  That depends, gentlemen of the jury, altogether upon the construction of this contract, and we think its construction with respect to measurements is a question which you will have to determine in the light of the evidence which you have heard respecting it.] [19]·

[The first item in this schedule calls for "bookcases and ward-

robes, mahogany, Series F, per lineal foot." There the kind of foot is mentioned. The term thereafter throughout the entire schedule is "per foot." It is suggested on the part of the defendants that inasmuch as "per lineal foot" is mentioned in the first item, that the term "per foot" thereafter mentioned must be something other than lineal foot. Is not just the contrary the conclusion to be reached? The schedule mentioning in the first item "per lineal foot," is it not fair to presume that the per foot mentioned thereafter was the lineal foot unless declared to be otherwise expressly or shown to be otherwise by the articles to which it was to be applied? But however that may be, you will consider what the term "per foot" means. The defense contends that it means the square foot, the surface foot. You will have to determine how that is.] [20]

In determining what the term "per foot" means, you will recall the evidence submitted on the part of the commonwealth respecting the schedule for 1898 and 1899, where the same term was used—"per foot"—with respect to furniture, and that under that schedule the defendant Sanderson was a bidder, received the contract and supplied furniture under that contract, and that he was paid for it by the lineal foot. That piece of testimony is proper for your consideration, gentlemen of the jury because that was a contract between the defendant Sanderson and the state, between the same parties who are parties to this contract, the construction of which we are considering, and you will determine how far that shows what the parties understood at that time, and how far their understanding at that time can throw light upon what was understood by them when they used the term "per foot" in the present schedule.] [21]

[An important piece of testimony to be considered in this connection is that of the cash price value of the articles furnished under the Sanderson bill. That was offered in evidence and received in evidence only for the purpose of enabling you to determine whether the term "per foot" meant square foot under the contract, as alleged by the defendant Sanderson. And it has effect in this way: If you find that the application of the measurement to the furniture would bring the price of the furniture so far above its actual cash value or market value, that

that price would be unjust and extortionate and unconscionable, it would be for you to say whether the parties ever intended that that kind of measurement should be applied to furniture.  We say that evidence was offered for that purpose.] [22]

[You will take the schedule of 1898 and 1899, the contract with Sanderson under it, his supply of furniture by the lineal foot and his receipts of payment for furniture supplied by the lineal foot, the Abbey contract, the letter of Houston to Sanderson directing that the wainscoting and painting should be billed under item 22 and should be paid for or charged by the square foot, and the difference between the actual cash value of the furniture supplied and the price which it would reach by measuring it by the square foot—taking all these matters into consideration you will determine whether the parties intended the term "per foot" to mean square foot.] [23]

[In considering the Abbey contract and the letter from Houston to Sanderson with respect to the wainscoting and painting, you will, of course, take into account the character of the work referred to—mural art painting.  Is that a flat surface?  Wall decoration, wainscoting and painting—is that a flat surface?  Does the fact that under the Abbey contract that work was to be paid for by the square foot, and under the Houston letter certain wainscoting and painting were to be paid for by the square foot, does that help you in determining whether or not the square foot measurement was to be applied to furniture?  As we said in the beginning, the first item in this schedule uses the term "lineal foot" with respect to wardrobes and bookcases.  When a flat surface comes to be measured, as, for instance, painting and wainscoting and mural art decorations and the like, it might be the very character of the work would take the case out of the measurement by lineal foot and bring it within the measurement of square foot.  But these are matters for you.] [24]

[It is admitted that the totals of the bills do not show square feet, but that the defendant Sanderson accounts for by saying that he reduced the bills and that then afterwards the reduced amount was distributed to the various articles, apportioned to the various articles, in the bills.  In that way he accounts for

the fact that the bills do not show, so far as the measurements set opposite the articles are concerned, whether these measurements were reached by the application of the square foot or lineal foot or any other measurement.] [25]

[Therefore we say you are to look into the question whether Sanderson, the contractor, knew this bill to be false and presented it intending to cheat and defraud the commonwealth.

In considering that question, you will again refer to the schedule of 1898 and 1899, to which we have already called your attention, where he, Sanderson, supplied the state with furniture under a schedule which called for it by the term "per foot" and furnished it at the lineal foot. What reason had he, if any, for thinking that "per foot" in the present schedule meant anything different from the term "per foot" in the schedule of 1898 and 1899? Had he any reason to believe that the term "per foot" in the present schedule meant square foot, when it meant and he so treated it as meaning lineal foot in the contract of 1898 and 1899? You will consider that. Did he believe that the honest interpretation of the term "per foot" put upon item 24 in the Abbey contract and mentioned in the letter of Huston to him with respect to wainscoting and painting, did he honestly believe, that that measurement applied to furniture? If he knew the amount or price of the furniture which would be reached by making a calculation by the square foot as compared with its actual market value, was exceedingly great, was there anything in that to throw light upon the question whether he honestly believed that the term "per foot" meant square foot in this contract? These are questions which you are to consider.] [26]

[Therefore, we say you are to look into the question whether Sanderson, the contractor, knew this bill to be false and presented it intending to cheat and defraud the commonwealth.

In considering that question, you will again refer to the schedule of 1898 and 1899, to which we have already called your attention, where he, Sanderson, supplied the state with furniture under a schedule which called for it by the term "per foot" and furnished it at the lineal foot. What reason had he, if any, for thinking that "per foot" in the present schedule

meant anything different from the term "per foot" in the schedule of 1898 and 1899? Had he any reason to believe that the term "per foot" in the present schedule meant square foot, when it meant and he so treated it as meaning lineal foot in the contract of 1898 and 1899? You will consider that. Did he believe that the honest interpretation of the term "per foot" put upon item 24 in the Abbey contract and mentioned in the letter of Huston to him with respect to wainscoting and painting, did he honestly believe, that that measurement applied to furniture?] [28]

[If he knew the amount or price of the furniture which would be reached by making a calculation by the square foot as compared with its actual market value, was exceedingly great, was there anything in that to throw light upon the question whether he honestly believed that the term "per foot" meant square feet in this contract? Those are questions which you are to consider.] [29]

[As to the question of the honesty of his belief as to item numbers in the bill; in that connection you will consider also if you find it to be a fact upon examining this bill and the five or six other bills that have been offered in evidence, if you find it to be a fact, the lack of uniformity in charging the articles furnished in this bill under the same item. You will examine the other bills and see whether the same articles in the one bill—in the present bill—and in the other bills are charged also under the same item. So far as we recall, but it is a matter entirely for you, in some of the previous bills the designed sofas are billed under item 25. You will look at it. If he honestly believed that the sofas were properly billed in the bill set forth in this indictment under item 22, why did he bill sofas in the other bills under item 25, which calls specifically for specially designed sofas and so in respect to the other articles of furniture? How far does that throw light upon the honesty of his belief that he was charging in this bill under the right item number.] [30]

[You will observe, gentlemen of the jury, that there are five persons charged in this indictment. Huston, Sanderson, Snyder, Mathues and Shumaker. Only four of these defendants are

now on trial before you. Huston was granted what in law is called a severance; he is not on trial now before you, and you have no power to render a verdict against him, but it is your duty to consider his conduct in relation to the bill set forth in this indictment so as to determine whether or not any one or more of the defendants who are on trial were parties to the conspiracy with him, charged in this indictment. Did Huston know that this bill was false? If you find it to be false, did he know it was false? You will have to determine that question from the evidence. You will recall the evidence with respect to the preparation of the schedule—it is a matter entirely for you—that he prepared and furnished the special schedule items from 21 to 41. Having furnished these items and having prepared this schedule, did he know that this bill in question was false? You will find upon examining this bill and the papers attached to it, that Huston approved it. As we recall it, it is marked "Approved, J. M. Huston." The date of the bill is March 28, 1906. The testimony shows that it was not paid until some time about the 15th or the 12th of April, about the middle of April. You will recall the evidence. His approval appears upon it. Whatever that approval may mean, there was some dispute here as to whether that approval, or any of his approvals, in his formal certificates meant anything more than an approval of the furniture as being in conformity with the drawings and designs. But however that may be you will have to determine the significance of the approval in ink which he signed. It is admitted that the formal certificate attached to the bill, though it appears to be his, was not his, that it was filled in over his signature by either Lewis or his brother; that he, J. M. Huston, was in Europe at that time, but he returned some time in the beginning of April, and you will determine whether or not he approved the bill in question before it was paid; how far that act of his, how far his attitude in relation to the bill in question aided and contributed to its payment—its passage and its payment. If his act contributed to its (the bill's) payment, then you will determine whether he knew it to be false, and whether he intended thereby to cheat and defraud the state. In this connection you will remember the testimony

of Lewis.   Lewis testified that neither Huston nor he—and they were associated together—had anything to do or were responsible for the measurements, or for the item numbers in the bills; that the measurements and the item numbers in the bills were suggested by the defendant Snyder and at his suggestion were taken from the footings of the bills rendered by the defendant Sanderson and put in the certificate.] [31]

Verdict of guilty, upon which the court sentenced the defendant to pay a fine of $500, the costs of prosecution and to undergo imprisonment in the pentitentiary by separate or solitary confinement at labor for two/years.

*Errors assigned* among others were (1–31) above instructions, quoting them; (34, 35, 37, 38, 45, 52) rulings on evidence, quoting the bill of exceptions.

*W. U. Hensel* and *P. F. Rothermel*, for appellant.—The court erred in not instructing the jury that by the terms of the contract entered into between the board of commissioners of public grounds and buildings and John H. Sanderson, John H. Sanderson had the right to charge—for the articles furnished under the invoice alleged to be false and fraudulent in the indictment—under item 22 of the schedule.

The court erred in not instructing the jury that by the terms of the contract entered into between the board of commissioners of public grounds and buildings and John H. Sanderson, John H. Sanderson had the right to charge—for the articles furnished under the invoice alleged to be false and fraudulent in the indictment—by the surface foot measurement.

And that the court erred in this connection in admitting evidence of the market value of the wooden furniture to aid the jury in the interpretation of the words "per foot" in the schedule, and in its instructions to the jury thereon, and in admitting as evidence for the same purpose the schedule of 1898 and 1899 showing a bid "per foot" by Sanderson on sofas, and that he charged for the same by the lineal foot: Laidlaw v. Marye, 133 Cal. 170 (65 Pac. Repr. 391); Christian v. Bank, 84 U. S. C. C. A. 53; Garrison v. United States, 74 U. S. 688; Otis v.

United States, 20 Ct. Cl. 315; Gillet v. Bank of America, 160
N. Y. 549 (55 N. E. Repr. 292); Edgar & Thompson Works v.
United States, 34 Ct. Cl. 205.

The court erred in admitting evidence as to the market
value of wooden furniture and in instructing the jury that it
should take into consideration for the purpose of determining
whether the surface foot measurement was intended by the con-
tract.

The verdict was against the law and the evidence: Ballan-
tine v. Cummings, 220 Pa. 621.

That the court erred in instructing the jury that they might
take into consideration alleged evidence of fraud and collusion
in the awarding of the contract.

That the court erred in admitting testimony to show that it
was not the duty of Huston under his contract as architect
with the board of commissioners of public grounds and build-
ings to certify to the correctness of the bills, and in its charge
leaving it open to the jury to determine that the contract did
not impose the duty on Huston to certify to the correctness of
the bills.

The commonwealth connected Huston with the alleged con-
spiracy by charging him with the duty of certifying to the cor-
rectness of the bill alleged to be false and fraudulent in the in-
dictment, and with having violated that duty by falsely and
fraudulently and by collusion with Sanderson and the others
certifying to the correctness of the said bill.

Notwithstanding this, the commonwealth introduced evi-
dence which was offered for the purpose of contradicting this
statement contained in the indictment. That is, evidence was
offered to establish that Huston had no such duty under his
contract as that of certifying to the correctness of the bills.

This evidence having been offered in direct contradiction
of the material allegation contained in the indictment was
manifestly inadmissible. The commonwealth having alleged
a conspiracy based, inter alia, upon the duty of the architect
to certify as to the correctness of the bills it could not on the trial
produce evidence to contradict this material averment.

Where defendants have been jointly indicted and con-

victed of conspiracy and an appeal is taken, if there be no evidence against one, the judgment must be reversed as to all: Isaacs v. State, 48 Miss. 234; Queen v. Gompertz, 58 Eng. Com. Law. 824; Com. v. McGowan, 2 Pars. 341.

*John Fox Weiss,* district attorney, *John E. Fox, James Scarlet, J. E. B. Cunningham,* assistant deputy attorney general, and *M. Hampton Todd,* attorney general, for appellee.— The construction of the contract, in so far as the description of the various articles to be furnished thereunder and the price per foot at which said articles were to be furnished, was for the court: Watson v. Blaine, 12 S. & R. 131; Reaney v. Cubertson, 21 Pa. 507; Stokes v. Burrell, 3 Grant, 241; Brown v. Foster, 51 Pa. 165; League v. Waring, 85 Pa. 244; Forrest v. Nelson, 108 Pa. 481; Shafer v. Senseman, 125 Pa. 310.

In determining the intention of the parties to a contract the manner in which they have previously acted under like contracts is evidence worthy of consideration.   Off v. Inderrieden Co., 74 Ill. App. C. 105; Jamieson v. Wallace, 167 Ill. 388 (47 N. E. Repr. 762).

In Hume v. United States, 132 U. S. 406 (10 Sup. Ct. Repr. 134), the contract was awarded upon a schedule similar to that upon which Sanderson's contract was awarded: James v. Morgan, 1 Levinz, 111.   In suits upon unconscionable agreements the courts of law will take the matter in their own control, and will, without the intervention of courts of equity, protect the parties against their enforcement: James v. Morgan, 1 Levinz, 111.

There was evidence tending to show fraud in awarding the contract: Com. v. Bartilson, 85 Pa. 482; Luckey v. Roberts, 25 Conn. 486; White & Co. v. Rosenthal, 173 Pa. 175.

There was no variance between the allegata and the probata in this case: Neff v. Landis, 110 Pa. 204; Bottomley v. United States, 1 Story, 135; Wood v. United States, 41 U. S. 342.

OPINION BY PORTER, J., July 14, 1909:

John H. Sanderson, the appellant, Joseph M. Huston, James M. Shumaker, William P. Snyder and William L. Mathues were

jointly charged with conspiracy to cheat and defraud the commonwealth and with having, in pursuance of such conspiracy, defrauded the commonwealth of the sum of $19,308.40. The indictment contained two counts, the first being drawn under sec. 128 of the Act of March 31, 1860, P. L. 382, and the second count charging conspiracy at common law; the time of the offense being charged in each of the counts as March 28, 1906. John H. Sanderson, the appellant, was the contractor for the furniture and equipment of the new capitol building of the state, at Harrisburg. James M. Shumaker was superintendent of public grounds and buildings of the commonwealth from January, 1903, to January, 1907. William P. Snyder was auditor-general of the commonwealth from the first Tuesday of May, 1904, to the first Tuesday of May, 1907. William L. Mathues was state treasurer from the first Monday of May, 1904, to the first Monday of May, 1906. Joseph M. Huston was the architect employed by the board of commissioners of public grounds and buildings of the commonwealth, and prepared plans, designs, detailed drawings and specifications for all interior fittings, furniture, electric and gas fixtures for the new capitol building. Joseph M. Huston moved for and was granted a severance by the court below and the case proceeded to trial against the other defendants, which resulted in a general verdict of guilty as indicted. We have in this case presented the appeal of John H. Sanderson.

The specifications of error are very numerous, but the learned counsel representing the appellant considered them in his oral argument and has grouped them in his brief under the following six general heads: 1. The court erred in not instructing the jury that by the terms of the contract entered into between the board of commissioners of public grounds and buildings and John H. Sanderson, the latter had the right to charge, for the articles furnished under the invoice alleged to be false and fraudulent in the indictment, under item 22 of the schedule. 2. The court erred in not instructing the jury that by the terms of the contract entered into between the board of commissioners of public gounds and buildings and John H. Sanderson, the latter had the right to charge, for the articles furnished under the

invoice alleged to be false and fraudulent in the indictment, by the surface foot measurement; and in this connection in admitting evidence of the market value of wooden furniture to aid the jury in the interpretation of the words "per foot" in the schedule, and in its instructions to the jury thereon, and in admitting as evidence for the same purpose the schedule of 1898 and 1899 showing a bid "per foot" by Sanderson on sofas, and that he charged for the same by the lineal foot. 3. That the court erred in admitting evidence as to the market value of wooden furniture and in instructing the jury that it should take that into consideration for the purpose of determining whether the surface foot measurement was intended by the contract. 4. That the verdict was against the law and the evidence. 5. That the court erred in instructing the jury that they should take into consideration alleged evidence of fraud and collusion in the awarding of the contract. 6. That the court erred in admitting testimony to show that it was not the duty of Huston under his contract as architect with the board of commissioners of public grounds and buildings to certify as to the correctness of the bills, and in its charge in leaving it open to the jury to determine that the contract did not impose the duty upon Huston to certify as to the correctness of the bills. A careful examination of the specifications of error in detail has convinced us that all the alleged errors complained of are properly embraced by the classification adopted by the learned counsel.

The first question involves the consideration of the contract, under the supposed provisions of which the appellant presented and the other defendants, respectively, certified, approved, settled and paid the bill or invoice which was charged to be false and fraudulent. The construction of contracts generally involves consideration of the circumstances under which and the subject-matter with regard to which the parties dealt. When the state enters into a contract it must necessarily act through the agency of officers and it is incumbent not only upon such officers but upon all who deal with them to take notice of their official authority, the limitations thereof and the provisions of the statute under which the officers act. The contract with Sanderson was entered into by the board of commissioners

of public grounds and buildings of the commonwealth of Penn-
sylvania on June 7, 1904, and under its provisions the con-
tractor supplied all the furniture, furnishings and fittings of the
new capitol building.   The board of commissioners of public
grounds and buildings was created by the Act of March 26, 1895,
P. L. 22, and is composed of the governor, the auditor-general
and the state treasurer of the commonwealth.   The statute was
passed to carry into effect the provisions of sec. 12, Art. III, of
the constitution, which provides in substance that the sta-
tionery, printing, paper and fuel used in the legislative and
other departments of the state government shall be furnished,
and the repairing and furnishing of the halls and rooms used
for the meetings of the general assembly and its committees
shall be performed under contract "to be given to the lowest
responsible bidder below such maximum price and under such
regulations as shall be prescribed by law," and that "all such
contracts shall be subject to the approval of the governor, au-
ditor-general and state treasurer."   The act of 1895 conferred
upon the board of commissioners of public grounds and build-
ings thus constituted the control and supervision of the public
grounds and buildings and all the repairs, alterations and im-
provements made and all work done or expense incurred in and
about such grounds and buildings, including the furnishing and
refurnishing of the same, and authorized the board to enter into
contracts for stationery, supplies, furniture, distribution of
documents, fuel, repairs, alterations or improvements "and
other matters needed by the legislature, the several depart-
ments, boards and commissioners of the state government, and
executive mansion."   The act expressly provided that all con-
tracts awarded by the board "shall be severally void, unless
first approved by the governor, auditor-general and state treas-
urer."   The act of 1895, while it empowered the board of com-
missioners of public grounds and buildings to enter into con-
tracts for furniture, etc., contains explicit provisions not only
as to the manner in which contracts shall be let but what step
shall be taken preliminary thereto.   The fifth section of the act
committed the enforcement of all contracts which it authorized
to the control and supervision of the board of commissioners of

public grounds and buildings, and for that purpose provided for the appointment of an executive officer to be known as the superintendent of public grounds and buildings, and the duties of that officer are in the act set forth in detail.  He is required, among other things, to notify the heads of the several departments, on or before the first day of April in each year, to furnish lists of all furniture and furnishings, stationery, etc., and all other matters or things that may be needed by their respective departments, for the fiscal year beginning on the first Tuesday of June in each year.  "On receipt of such notice it shall be the duty of the heads of the several departments, to make out detailed lists in accordance therewith, giving, as far as practicable, a detailed description of what is needed; similar lists shall be prepared by the superintendent for the needs of the public grounds and buildings and executive mansion.  Upon the receipt of such lists the superintendent shall consolidate and classify the articles named therein, under such regulations as may be prescribed by the board of public grounds and buildings, taking care that there shall be full descriptions given, with make and number of goods when possible, and proper maximum prices fixed, and whenever deemed necessary by the board he shall have designs and specifications prepared for their approval of any furniture or furnishings, repairs, alterations and improvements, paying for the preparation of the same out of the board's general fund, and shall state in the list or schedule that the work or articles for which the designs and specifications are prepared are to be done or furnished in accordance therewith, and that the designs or specifications will be found in his office for inspection, and copies of the same shall be furnished to the successful bidders. . . . And when the superintendent has so prepared the list or schedule the same shall be presented to the board of public grounds and buildings for approval.  The board after conferring with the heads of the departments and other persons in authority, shall have the power to make such changes therein as shall be deemed proper, and when the same has been approved and signed by a majority of the board it shall be returned to the superintendent, who shall cause it to be printed in pamphlet form as a schedule of stationery, papers,

supplies, fuel, furniture, furnishings, distribution of documents, repairs, alterations, improvements and other matters and things needed for the public grounds and buildings." "Said schedule shall state that bids will be received on one or more of the items of any classification of the schedule." The statute provides the manner in which the board shall by public advertisement invite sealed proposals for contracts to furnish all stationery, furniture and other matters or things required for the public grounds and buildings; "said proposals to be delivered to the board of public grounds and buildings on or before 12 o'clock, meridian, on the first Tuesday of June following the date of advertisement, who shall on said first Tuesday of June, at 12 o'clock, meridian, open and publish said proposals, and as soon thereafter as practicable award the contracts to the lowest responsible bidder on each of the items of the several classifications of the schedule." The manifest intention of the statute was to require that the schedules should be so prepared that each item of every classification therein contained should make clear what was to be furnished under that item. It was for this purpose, manifestly, that the provision was incorporated that whenever deemed necessary by the board "designs and specifications should be prepared for their approval of any furniture or furnishings," and that the schedule should state that the work or articles for which the designs and specifications are prepared are to be done and furnished in accordance therewith. The purpose of the statute, as well as of the constitutional provision, was to secure to the state the advantage of competition in the furnishing of all supplies; not merely formal competition but the presentation to all persons of a fair opportunity to bid upon equal terms. The competition provided for by this statute was not merely competition upon the schedule as a whole, not competition between omnibus contractors only, but competition upon each item of every classification of the schedule. The clearly expressed intention of the statute was that the board of public grounds and buildings should invite proposals "on one or more of the items of any classification of the schedule," and that they should "award the contracts to the lowest responsible bidder on each of the items of the several

classifications of the schedule." The award of the contract upon each item of the several classifications of the schedule is, under this statute, in effect a separate contract. If one bidder happens to be the lowest responsible bidder upon fifty or one hundred of the items and enters into one contract covering all of the items, the agreement to furnish each of the items at the price agreed upon still remains an independent covenant.

Such was the law under which the board of public grounds and buildings acted when, on May 10, 1904, they adopted the schedule for the year beginning the first Tuesday of June, 1904. That schedule included, as one of its classifications, the "Special furniture, carpet, fittings and decoration schedule for the equipment of the new capitol building, Harrisburg, Pa." This schedule contained forty-one items, regularly numbered as distinct items. The board of public grounds and buildings had employed Huston to prepare designs and specifications for all the furniture, carpets and electric light fixtures in the new building and all the designs and specifications for such furniture, carpet and fixtures had been approved and adopted by the board in April, 1904, and the schedule stated that complete plans for the furniture, fittings, decorations and furnishings could be seen at the office of Huston in Philadelphia, where full instructions would be given. These plans were referred to in the various items of the schedule under the terms "series F," referring to the furniture plans, "series C," referring to the carpet designs, and "series E-F," referring to the designs for electric light fixtures. The items contained in this schedule which are material to the consideration of the present question are as follows:

| Item No. | | Maximum Price |
|---|---|---|
| 22. | Designed furniture, fittings, furnishings and decorations of either woodwork, stone, marble, bronze, mosaic, glass and upholstery per foot | $20 00 |
| 25. | Designed sofas, seating, etc., either upholstered wood, metal or stone, series F.....per foot | 15 00 |

27. Designed special desks and tables, series F

per foot    12 00

The maximum prices are in these schedules fixed for each item, in accordance with the provision of the constitution and of the act of 1895, indicating the price in excess of which the state would not pay, and at the foot of the special schedule now involved was this express declaration, "No bid above the limit herein fixed will be received." The schedule having been duly advertised, the board of public grounds and buildings considered the bids on June 7, 1904, and awarded to Sanderson the contract for each of the forty-one items included in this special schedule. His bid upon which he was awarded the contract for item 22 was eight per cent off the maximum price, or $18.40 per foot. The bid upon which he was awarded the contract for item 25, "designed sofas, seating, etc.," was fourteen per cent off the maximum price of $15.00 per foot, or $12.90 per foot, net. The bid upon which he was awarded the contract for item 27, "designed special desks and tables," was ten per cent off the maximum price of $12.00 per foot, or $10.80 per foot, net. The designs for the sofas, tables and desks were all then at the office of Huston. Sanderson furnished a large number of sofas and tables under this contract, many of which had been paid for prior to March, 1906. The invoice, bill or claim upon the presentation, approval, settlement and payment of which this prosecution is founded was among the last which the commonwealth was called upon to pay under the contract. This invoice included sixty-five designed sofas, series F, which were charged for as measuring 1,318½ feet at $18.40, net, per foot, amounting to $24,260.40; eighty designed oblong tables, series F, which were charged for as 671 feet at $18.40, net, per foot, $12,346.40; twenty-four designed oval tables, series F, charged for as 246½ feet at $18.40, net, per foot, $4,531; fifty designed round tables, series F, charged as 198½ feet at $18.40, net, per foot, $3,652.40; seven designed square tables, series F, charged as containing thirty-one feet at $18.40, net, per foot, $570.40. The commonwealth charged that even if the sofas and tables charged for in the invoice had contained the number of feet

for which the charge was made that the invoice or bill was false in that the sofas should have been charged for, under item 25 of the contract, at $12.90, net, per foot and that the tables should have been charged for under item 27 of the contract at $10.80 net per foot, so that even if the measurements had been correct the sofas and tables should not have been billed and paid for at more than the following amounts: sixty-five designed sofas, series F, $17,008.65, eighty designed oblong tables, series F, $7,246.80; twenty-four designed oval tables, series F, $2,659.50; fifty designed round tables, series F, $2,143.80; seven designed square tables, series F, $334.80. Sanderson, the appellant, contended at the trial that sofas and tables were properly and legally, under the contract, to be charged for by him and paid for by the state under item 22 of the schedule, at the rate of $18.40, net, per foot. The determination of the question thus raised depended upon the construction of the covenants arising out of Sanderson's written bids upon the several items of the schedules and the acceptance of such bids on behalf of the state.

The state had in the schedule invited proposals to supply the furniture in question in accordance with designs then in existence, and it classified the articles to be furnished under forty-one different items, forty of which specifically designated the articles to be furnished or work to be done under that particular item, the exception being item 22, which was drawn in terms so general that if it stood alone it might be held to cover almost anything used in the interior furnishing, fitting and decoration of the building. The state invited proposals, in item 25 of the schedule for furnishing "designed sofas, seating, etc.," at so much per foot, and specifically declared that it would not pay a higher rate than $15.00, and, in item 27, for furnishing "designed special desks and tables," at so much per foot, and specifically declared that a higher rate than $12.00 would not be paid. It is an undisputed fact that the sofas and tables in question were made under the plans and specifications in the schedule referred to. The designs at the office of Huston to which the items of the schedule refer covered many different articles and varieties of work. Of some of these articles or

work it may have been difficult to give in the schedule the "full description" required by the act of 1895, and such articles or work would come within the provisions of item 22. Prospective bidders upon an examination of the plans and specifications and comparing them with the schedule could determine under which item of the latter any particular furniture or work was included and the maximum price which the state would consider in awarding the contract. No bidder who thus examined the designs and specifications could have arrived at the conclusion that any fair and honest construction of item 22 in the schedule could hold that item to include articles or work which were specifically dealt with by name and particularly described in any one of the other forty items of the schedule. There was in this contract no ambiguity as to the item of the schedule under which sofas and tables were to be furnished by Sanderson and paid for by the state, and the question was one of law for the court to determine: Watson v. Blaine, 12 S. & R. 131; Reaney v. Culbertson, 21 Pa. 507; League v. Waring & Co., 85 Pa. 244; Forrest v. Nelson, 108 Pa. 481; Shafer v. Senseman, 125 Pa. 310; Brown v. Foster, 51 Pa. 165. The learned judge of the court below correctly held that this appellant under his contract had agreed to furnish the state, under item 25, designed sofas at $12.90, net, per foot and, under item 27, designed tables at $10.80, net, per foot, and that he was not legally entitled to be paid for said articles, respectively, at a higher rate.

The second ground of complaint of the appellant is the refusal of the court to charge that, under the contract, he had a right to charge for sofas and tables by the surface foot measurement. The contract fixed the rate at which the appellant was to be paid for "designed sofas, seating, etc., either upholstered wood, metal or stone, series F" at $12.90, net, per foot, and for "designed special desks and tables, series F," at $10.80, net, per foot. The appellant contends that the court should have instructed the jury, as matter of law, that he was entitled to be paid at these rates for each square foot of surface in said articles, respectively. The question involves the construction of the meaning of the term "per foot" in items 25 and 27 of the

schedule.   When a contract provides for the sale of sofas and
tables at a fixed price "per foot," without providing any man-
ner in which they are to be measured, how must the measure-
ment be made?   Was that a question of law, as applied to the
subject-matter, in this case?   The learned judge of the court
below submitted the question to the jury, under the evidence
presented, which action the appellant contends was erroneous.
It may here be observed that the appellant offered no evidence
whatever tending to show that the term, "per foot," had any
established or recognized meaning in the furniture business or
trade.   In the absence of such evidence, is not the more prob-
able meaning of the term "per foot," as applied to "sofas and
seating," the lineal foot?   The seating capacity of a sofa or
bench is determined by its length, and an agreement which
provided that a contractor should place in a public hall 1,500
feet of benches, sofas and seating might reasonably be con-
strued to mean that the seats should in the aggregate be of the
length specified.   We instance this merely as indicating that
the question is one of fact rather than of law.   Was there any-
thing in this contract which should have led the court as matter
of law to declare that the system of measurement contracted
for was the square foot of surface?   The first item of this iden-
tical schedule is "bookcases and wardrobes (mahogany), series
F, per lineal foot, maximum price $37.00," and upon this item
Sanderson bid fifty-eight per cent off and to him that contract
was awarded.   There was thus presented to the court, in the
very contract under consideration, the indisputable fact that
the "lineal foot" might be used in measuring and fixing the
price of furniture.   One of the sofas offered in evidence in this
case had pasted upon it the manufacturer's tag with these
words "six feet," without further indication as to the mean-
ing of the term, yet that sofa was six feet in length.   Nothing
was presented at the trial which would have warranted the
court in declaring as matter of law that the appellant was en-
titled to charge for sofas or tables according to the square foot
of surface measurement rather than according to the number
of feet in their length, or the number of cubic feet of materials
of which they were composed.   The term "per foot" as used in

this contract related to a trade or business and had no well-defined legal meaning; it created an ambiguity; the court could not determine with that certainty which should mark judicial action whether it meant lineal foot, square foot or cubic foot, and its meaning was for the jury, under the evidence: Ford v. Buchanan, 111 Pa. 31; McDonough v. Jolly, 165 Pa. 542; National Dredging Co. v. Mundy, 155 Pa. 233; Dixon-Woods Co. v. Phillips Glass Co., 169 Pa. 167. "All trades have their usages; and when a contract is made with a man about the business of his craft, it is framed on the basis of its usages, which become part of it, except when its place is occupied by particular stipulations:" Pittsburg v. O'Neill, 1 Pa. 342; Welsh v. Huckestein, 152 Pa. 27; Martinsburg Bank v. Telephone & Supply Co., 150 Pa. 36. These cases hold that the principle is applicable to obscure and ambiguous expressions relating to the system of measuring applicable in any particular trade or business. The meaning of the term "per foot" in items 25 and 27 of the schedule was properly submitted to the jury under instructions of which the appellant has no reason to complain.

The meaning of the term "per foot," as used in item 25 and item 27 of this contract being for the jury it was competent for the commonwealth to produce evidence which properly tended to give light upon that meaning. When parties to a contract use a term which has no well-defined legal meaning, evidence as to the construction which such parties have given to that term under the same or prior contracts, relating to the same subject-matter, is properly admitted and is entitled to consideration: People's Natural Gas Co. v. Wire Co., 155 Pa. 22; Firth & Foster Bros. v. Hamill, 167 Pa. 382; 17 Am. & Eng. Ency. of Law, (2d. ed.), 25. The commonwealth offered in evidence the furniture schedule of 1898 upon which the contracts for the years 1898 and 1899 were awarded by the board of commissioners of public grounds and buildings. That schedule contained, among others, "Item No. 7. Furniture schedule, leather covered sofas, mahogany, West Indian, per foot, maximum price $35.00." Upon that item John H. Sanderson, this appellant, bid "thirty-eight per cent off," and to him the contract was awarded. This was accompanied by evidence that under that contract the ap-

pellant had furnished to the state a number of sofas and had charged and been paid for the same, at the rate "per foot," named in the contract, for each foot in the length of the sofas. The admission of this evidence was objected to by Sanderson upon the sole ground that it was irrelevant. The objection was overruled and the evidence admitted, which is the subject of the thirty-ninth specification of error. The authorities above cited fully vindicate the action of the court, and the specification of error is overruled. The court in admitting this evidence was very careful to instruct the jury that it applied to the defendant Sanderson alone and to confine the effect of the evidence to its bearing upon the honesty of the contention of Sanderson that he had the right under the present contract to charge for sofas, at the rate "per foot" of his bid, for each square foot of surface. The appellant subsequently moved the court to strike out this evidence upon the ground that the furniture comprehended in the schedule of 1898 upon which the bids were received and the contract awarded, were "as per designs and specifications submitted," and that the schedule offered by the commonwealth was not accompanied by any designs and specifications. The court overruled this motion, and upon that action the forty-fifth specification of error is founded. The motion seems to have been based upon a mere speculation as to whether or not any designs and specifications accompanied the schedule of 1898–1899, and, if so, what they might contain. We have carefully examined the evidence as printed by appellant and have found nothing therein which indicates that item No. 7 in the schedule of 1898, referred to either designs or specifications. It was not shown that there were in fact designs and specifications which modified or explained the meaning of the term "per foot" in the schedule. Even if there were designs and specifications, they, presumably, were such as contemplated by the act of 1895 and related not to the price "per foot," but to the physical design and construction of the furniture. The motion to strike out was properly refused.

The appellant further complains that there was error in the manner in which the court submitted to the jury the meaning

of the term "per foot" used in the contract. The appellant contended in the court below that, as a matter of law, the surface foot measurement was the one stipulated for in the contract for sofas, and further contended that as the contract was ambiguous, Sanderson would have the "right to elect the foot measurement which suited him best." The latter contention was based upon the ground that as the terms of the contract had been prepared by the state officers, any ambiguity in the contract should be construed against the state and in favor of the contractor. The question was raised by the defendant's fourteenth point: "That if the jury believes that the contract evidenced by the schedule, plans and specifications, under which Sanderson bid and under which the contract was awarded to him, was, in using the term 'per foot' ambiguous and the term might with equal propriety be applied to two or more systems of foot measurement, Sanderson, the contractor, would have the right to select that measurement which he might regard as serving him best." The answer of the court was: "This we say is true if such selection did not result in an unconscionable, extortionate and unjust charge." It will be observed that the point contains the qualification limiting the alleged right of election of the appellant to such systems of measurement as "might with equal propriety be applied." The court affirmed the point with the qualification, in effect, that Sanderson would not have the right to select a system of measurement which would result in an unconscionable, extortionate and unjust charge. How can it be said that a charge so resulting could "with equal propriety be selected"? The point was drawn in terms most indefinite and sweeping. Had it been unqualifiedly affirmed the jury would have been justified in assuming that it meant that the only limit upon the right of Sanderson to fix whatever price he saw fit on the sofas, furnished under this contract, was his own desire. The point did not limit Sanderson, in the selection of the construction to be put upon the term "per foot," to the meaning which that term had in the trade or business or to the different standards of measurement known to the trade, as applied to the subject-matter. The point might properly have been refused and the appellant has no reason-

able ground to complain of the manner in which it was an-
swered.

The commonwealth produced evidence which clearly estab-
lished that in prior invoices for sofas and tables furnished under
this same contract this defendant had repeatedly charged and
the state officers had as often paid for designed sofas under item
25 at $12.90, net, per foot, and designed tables under item 27 at
$10.80, net, per foot. This evidence at once raised a question
for the jury, as to whether the defendants innocently and hon-
estly so construed the contract as to provide that sofas and
tables should be paid for at the rate of $18.40 per foot, under
item 22, instead of at the rates specifically provided for those
articles in items 25 and 27. The commonwealth further proved
that all sofas and tables covered by the invoice in question were
charged for as containing a number of feet very largely in ex-
cess of the number of feet in length of the respective articles; the
sofas in every case having been charged and paid for, at the net
rate per foot, under item 22; but upon the basis of three times
their length, and the tables being billed under no regular or
consistent system of measurement, but always greatly in excess
of their length. The commonwealth also produced evidence
showing the manner in which previous invoices for furniture
under the same contract had been billed, approved, certified,
settled and paid for by the defendants, as well as establishing
the manner in which the schedule had been prepared, the con-
tract awarded and the several defendants acted thereunder.
This evidence established that in previous invoices under the
contract this appellant had charged for and the other defendants
had certified, approved and paid for very many sofas and other
articles of wooden furniture, under either item 22 or 25, upon
the basis of a number of feet not only greater than the lineal
feet measurement, but very largely in excess of the number of
square feet in the surface of the several articles. The evidence
as to the preparation of the schedule, the award of the contract
thereunder and the manner in which previous invoices had been
settled and paid was admitted subject to exception and will be
considered in connection with the fifth proposition argued by
the learned counsel for the appellant. The third proposition

upon which the learned counsel relied was argued in connection with his second proposition, because of its bearing upon the meaning of the term "per foot" in the contract, although the admission of the evidence of which complaint is made was upon the case of the commonwealth in rebuttal. This evidence was admitted for the purpose of showing the market value of the furniture which the state acquired under this contract, and particularly that embraced by the invoice upon which the indictment is founded.

The appellant did not present himself as a witness and thus give the court below and the jury the benefit of his personal knowledge of the meaning of the term "per foot" in the furniture business. He contended through his counsel that the meaning of the term was a question of law for the court, and that the contract required that he be paid, under item 22, at the rate of $18.40 for each square foot in the surface of sofas and tables, or as the meaning of the term "per foot" in the contract was ambiguous he was entitled to charge for and be paid according to the system of measurement most advantageous to him; and that even if sofas and tables were not properly chargeable under item 22, yet the commonwealth was not defrauded, for the sofas and tables involved in the invoice contained a number of square feet of surface very largely in excess of the number at which they were charged, that if the sofas and tables had been charged for at the rate of $12.90 per foot for the former and $10.80 for the latter, under items 25 and 27, for each square foot of surface, the furniture covered by this invoice would have cost the state $130,614.55 (the surface feet measurement of such furniture being 12,497 square feet) instead of $53,318.60, the amount which the state was called upon to pay. The appellant called witnesses to prove the manner in which the furniture had by his direction been measured and billed, that the earlier invoices rendered under the contract had by the direction of the appellant been billed at the rates fixed in the various items of the schedule and for the number of square feet in the surface; that in the invoice in question the sofas had been billed at the rate of three feet for each foot of their length, which amounted to much less than the number of surface feet in the sofas re-

spectively, and that this reduction was made because of a request from the defendant Huston that Sanderson should reduce the rates which he was charging for the furniture, under the contract. It may here be observed that it appeared in evidence that the reason for this request of Huston was because of the demand of Governor Pennypacker, who protested, when late in the year 1905 he discovered the enormous amount of the expenditures already incurred for fitting and furnishing the capitol building under this contract. The evidence produced by Sanderson as well as that on behalf of the commonwealth did establish that, if the appellant was entitled to be paid for each square foot of surface, the number of feet in the sofas and tables covered by this invoice was greater than the number charged for, in other words, the charge was for more than the number of lineal feet in the sofas and tables but was for less than the number of square feet in the surface of the same. It was demonstrated by actual measurement, for example, that one of the sofas (commonwealth's exhibit No. 52) which was six feet in length, and was billed in this invoice at eighteen feet, actually contained 54¾ square surface feet, which at $18.40 per foot, the rate charged, would make the price of this sofa to the commonwealth $1,007.40. The price which under the invoice the state paid the appellant for this sofa was $331.20, or less than one-third of the amount which the appellant contended at the trial he was entitled to be paid for it, under his construction of the contract. The employees of the appellant testified that they had by his direction computed the number of square feet in the various articles of furniture and the evidence established that the appellant had asserted the right to be paid, at the rate fixed in the several items for each surface foot in the various articles. There can be no question under all the evidence that in the earlier invoices the appellant charged for and the other defendants certified, approved, settled and paid for every square foot in the surface of the articles, and in many instances for a great many more surface feet than the article contained. In the case of the senate sofa (commonwealth's exhibit X) which was charged and paid for as containing 151¼ feet, $12.90 per foot, or a total of $1,951, it was demonstrated in court that this sofa

contained but ninety-four square surface feet, which, at the rate named, would amount to $1,212.60; and the "throne chair" which was charged for, under item 25 at $12.90 per foot, as containing fifty-nine feet, or a total of $761, was in court shown to contain but fifty-three surface feet. Some sofas, furnished under previous invoices, were charged for at practically the number of cubic feet in a receptacle which would contain the sofa. With regard to tables no consistent system of measurement seems to have been used. Some were billed at the number of feet in the length of the table; some at a number which indicated that the length or width had been multiplied by the height from the floor and others by the cubic measurement of a box which would contain the table. The rostrum in the senate caucus room (exhibit No. 104) was charged and paid for, under item 22 at $18.40 per foot, as containing 1,910 feet, amounting to $35,144, and the evidence established that the number of square feet in the surface of this rostrum was only 907 feet. The rostrum in the house caucus room (exhibit No. 103) was billed and paid for, at $18.40 per foot, as containing 3,022 feet, amounting to $55,604; and the subcontractor who made this rostrum testified that the surface measurement thereof was 1,176 square feet. The contention of the appellant was that he was entitled to charge for the sofas and tables by the surface foot measurement; he founded this claim upon the provisions of the contract alone. He presented in support of his contention no evidence whatever that this system of measurement was one known to the furniture business, or that in the trade a sale of sofas or tables by the foot meant the square foot of surface therein contained. So far as indicated by the evidence in this case the only sale of sofas at a rate "per foot" which ever had been made, prior to the award of the contract in question, was that made by the appellant to the state, under the schedule of 1898–1899, when he construed the term "per foot" as meaning lineal foot of the sofa. When the appellant's testimony had closed it appeared that the parties had used in the contract a vague and indefinite term, the meaning of which the court could not declare as matter of law, there was no evidence that the term had any generally recognized meaning in the trade to

which it related; the only person who had sold sofas under a
contract using such a term was this appellant, and in executing
that contract he had given the term an interpretation directly
the opposite of that for which he was at the trial contending.
This was the condition when the commonwealth, in rebuttal,
offered to prove the market value, at the time of the contract,
of the furniture which under the contract the appellant had un-
dertaken to furnish at fixed prices "per foot," for the purpose
of showing that the meaning of the term "per foot" contended
for by the appellant was unreasonable, in that it would result
in an exorbitant and unconscionable contract. The appellant
objected to the admission of this evidence, which objection was
overruled. The learned judge of the court below in admitting
the evidence said: "We will receive this offer for the purpose of
refuting the defense set up by the defendant, Sanderson, that
'per foot' in the contract means square foot and that he be-
lieved it to mean such and for that purpose solely," and subse-
quently in instructing the jury limited the effect of the evidence
to the meaning of the term "per foot" in the contract and the
honesty of Sanderson's contention that he believed it to mean
square foot.

   Mature consideration has led us to the conclusion that this
evidence was properly admitted. The term "per foot" as used
in the contract was indefinite, it had no well-recognized legal
meaning. When such obscure terms are used to fix the price
of a commodity it is usually found that those terms have a well-
recognized meaning in the trade or business to which they re-
late. The contention of the commonwealth and of the appel-
lant led to widely different results; the meaning of the term
contended for by the commonwealth would make the price of a
sofa six feet in length $77.40 while that contended for by the
appellant would make the price of such sofa $1,007.40, or more
than thirteen times greater. The circumstances under which
parties contract, and the subject-matter with regard to which
they deal are proper to be taken into consideration in arriving
at the meaning of their contract. When a contract for the pur-
chase or sale of an article expresses the price in obscure terms,
which may have two or more different meanings resulting in

widely varying results, it is certainly proper to take into consideration the subject-matter of the contract and the value thereof in ascertaining the meaning of the contract. If the contention of one of the parties would result in a contract so unconscionable and absurd that no sane man would intentionally enter into such covenants, that fact is proper to be considered in ascertaining the actual meaning of the obscure term. The decision of the supreme court of the United States in Hume v. United States, 132 U. S. 406, is an authority in point. The contract in that case was awarded upon a schedule including many different items, similar to that with which we are now dealing. The secretary of the interior advertised for proposals for furnishing supplies, inviting bids upon the separate items of the schedule. Item No. 97 of this schedule provided for the purchase of shucks. It had been the custom of the government to buy shucks by the hundredweight, but in making up this schedule a mistake occurred by reason of the word "pounds" in the printed form, following the word "shucks," not having been stricken out and the words "hundredweight" inserted. Hume bid upon a large number of the items in the schedule, his bid upon item No. 97 being sixty cents, and he was awarded the contract on that item together with many others in the schedule. In so far as the purchase of shucks was concerned the plaintiff was apparently to furnish the same at the rate of sixty cents per pound. The government paid the plaintiff for the goods furnished under the other items in the schedule at the contract price but refused to pay him for shucks at the rate of sixty cents per pound, the amount of his claim for that item being $4,032. He brought an action in the court of claims and the government replied that the claimant had in reality agreed to furnish shucks at the rate of sixty cents per hundredweight and not at the rate of sixty cents per pound; and that the phrase "per pound" was a clerical error. The court of claims admitted evidence of the market value of the shucks and found that they were worth not more than $35.00 a ton, that the letter of the contract would result in a grossly unconscionable bargain and that the claimant was not entitled to recover more than the market value of the shucks. The case was carried to the

supreme court of the United States and the opinion of Chief Justice FULLER bears directly upon the point now under discussion and is most convincing: " In order to guard the public against losses and injuries arising from the fraud or mistake or rashness or indiscretion of their agents, the rule requires of all persons dealing with public officers, the duty of inquiring as to their power and authority to bind the government; and persons so dealing must necessarily be held to a recognition of the fact that government agents are bound to fairness and good faith as between themselves and their principal: Whiteside v. United States, 93 U. S. 247; United States v. Barlow, 132 U. S. 271. If the claimant intended to induce the agents of the government to contract to pay for these shucks thirty-five times their highest market value, and the agents of the government knowingly entered into such a contract, it will not be denied that such conduct would be fraudulent and the agreement vitiated accordingly. If the claimant knew that a clerical error had been committed, of which the agents of the government were ignorant and deliberately intended to take advantage of the error to obtain the execution of the contract for the payment of so grossly unconscionable a price, or if the facts were such that he must be held to have known that their action, if understandingly taken, would be a palpable dereliction of their duty to their principal, and, notwithstanding, he sought to profit by it, the character of the fraud so far as the claimant is concerned, is not changed by the fact that such action was the result of the negligence or mistake of the government's agents, untainted by moral turpitude on their part. This claimant by his replication insists that the price of sixty cents per pound for shucks 'was the price at which he intended to bid, and that there was no mistake on his part in making it the bid.' This is an admission, when taken with the findings of fact, that he designed to commit the agents of the government to a contract, 'such as no man in his senses and not under delusion would make on the one hand,. and as no honest and fair man would accept on the other,' and is fatal to his recovery according to the letter of the contract. Nor is its effect in that regard weakened in any degree by the suggestion that, under bids on each item separately, the claim-

ant made but little profit, or none at all, on some of the articles." The court held that evidence of the market value of the shucks had been properly admitted by the court of claims. Sanderson is presumed to have known the market value of the furniture which he was to furnish under the contract. Knowing this did he believe that the state officers, in using the term "per foot" in the contract, intended to pay him, at the rate fixed, for each square foot of surface in the sofas furnished under the contract, if such a construction would lead to an extortionate and unconscionable bargain? If he did not believe that the agents of the state so understood the contract, then his contention at the trial as to the meaning of the term "per foot" in the schedule was not made in good faith. The evidence was, therefore, admissible, as against Sanderson and for the purpose to which the court below limited its effect. If Sanderson believed that the state officers were knowingly and intentionally using in the contract an ambiguous and absurd term, capable of more than one construction, and that they would put upon it a construction which would permit of their paying him an exorbitant and unconscionable price for the furniture, then he knew that the agents of the state were guilty of a palpable dereliction of their duty to their principal and that the contract would be fraudulent in its very inception. This view of the situation would render the evidence of the market value ' of the furniture admissible against all the defendants, but as it involves the propriety of the 'action of the court in permitting the jury to consider evidence of fraud and collusion in the awarding of the contract, we will consider it in connection with that question, which is the foundation of the appellant's fifth ground of complaint. The evidence as to the value of the furniture disclosed that the prices paid by the state for almost every article furnished under the contract were grossly exorbitant and unconscionable, varying from about three to twenty times their market value at the time the contract was made and the furniture delivered. The following are fair illustrations. The six feet sofa (exhibit No. 52) for which Sanderson was entitled to receive, under his construction of the contract, $1,007.40, but for which he demanded and was paid $331.20, was worth only from $120 to $135. The sen-

ate sofa (exhibit X), containing ninety-four square feet of surface, but billed and paid for as 151¼ feet at $1,951 was of the market value of only from $280 to $315. The "throne chair," which had fifty-three feet of surface, but was billed as containing fifty-nine feet and for which $761 was paid was worth from $175 to $200. The rostrums in the senate and house caucus rooms, which were billed at a number of feet greatly in excess of their surface measurement, for which the state paid in the aggregate $90,748, were of the aggregate market value of $4,000. These are only fair examples, and the evidence conclusively established that the construction of the term, "per foot," contended for by Sanderson, when applied to the subject-matter would unquestionably render the contract unconscionable. At the time the contract was awarded, Huston, the architect, after considering the bids, had advised the board of public grounds and buildings, Governor Pennypacker then being present, that the probable cost to the state of all that Sanderson would furnish under the contract would be from $500,000 to $800,000. This appellant rendered invoices and was paid under this contract $5,376,308.52; six of these invoices were for wooden furniture under items 22, 25 and 27 of the schedule, to the aggregate amount of $876,066.40.

The fourth ground of complaint presented by the defendant is that the verdict was against the law and the evidence. The consideration of this question might be reserved for the conclusion of this opinion, but because of the number of the assignments of error, we will follow the order adopted by the learned counsel for the appellant. We find no error in the rulings of the court below called to our attention by the argument upon the part of the appellant. We are of opinion that under the evidence the case was for the jury. The inferences properly to be drawn from the evidence were peculiarly for the jury, and the evidence was sufficient to sustain the verdict.

We pass now to the consideration of the fifth question raised by the assignments of error and argued on behalf of appellant. Was evidence of fraud and collusion in the awarding of the contract admissible under the indictment, and did the court err in instructing the jury that it should take into consideration

evidence of fraud and collusion in awarding the contract? This question is most material and important to the proper determination of this case. The terms of the contract are most peculiar, and if the court below was by the law precluded from permitting the jury to take into consideration circumstances leading up to the execution of that contract, the language in which the schedule was prepared, the circumstances accompanying the actual award of the contract, the construction subsequently put upon the various items of the contract by all the defendants and the manner in which they dealt with the bills rendered by Sanderson under the contract and paid out the money of the state, then the scope of the inquiry must have been confined within very narrow limits. Was the court below bound to accept the contract awarded upon the schedule of 1904–1905 as a sacred thing, legally presumed to have been honestly made? That it was seems to be the contention of the appellant. The argument is founded on the assumption that the acts of Huston and Shumaker in preparing this schedule, of Snyder and Mathues in approving the schedule and awarding the contract thereon, and the subsequent acts of the two latter, as auditor general and state treasurer, in approving the contract, were the acts of the state, in its sovereign capacity. The contract is that of the state, the expenditure of the money of the state, only, was the result of its execution. The $53,318.60 which Sanderson received for the furniture, under the invoice upon which the indictment is based, was the money of the state, and the ground upon which Sanderson received the money and the agents of the state caused it to be paid was supposed to be because it was lawfully due him. The money might have been apparently due the appellant, upon consideration of the words appearing upon the face of the contract, but whether it was lawfully due him was ultimately dependent upon the validity of the contract. The officers of the state had contracted that Sanderson should be paid for the furniture, not out of their own pockets, but out of the treasury of the state. The commonwealth charged that the contractor, the appellant, and its agents, the state officers, had entered into a criminal conspiracy to defraud it, and charged the defendants with the overt

act, in pursuance of such conspiracy, of defrauding it in paying this bill. Can it be said that a state officer may enter into a criminal conspiracy with a contractor and in pursuance of that conspiracy execute on behalf of the state an unconscionable contract, under the express provisions of which the state is called upon to pay a large sum of money which it ought not to pay, and that when the money is actually paid under the contract, and the officers and contractor are indicted for a conspiracy to defraud and the payment of the money is alleged as the overt act under the conspiracy, that it is not competent for the state to show that the contract was intentionally and corruptly made in such terms as to make possible the consummation of the fraud? In such a case the contract is the instrument selected and created for the purpose of accomplishing the fraud and its connection with the final act is direct and material. "Where in conspiracy an overt act is done within two years, and said act is but one of a series of acts committed by the parties, evidently in pursuance of a common design and to carry out a common purpose, such acts would be evidence, provided they tend to show that the last act was a part of a series and the result of an unlawful combination; and such evidence may satisfy a jury of the existence of a conspiracy at the latter period. And this though some of the prior acts may have occurred at a time when, as an independent conspiracy, it would have been barred by the statute. For, as before said, the overt acts are the evidence from which a conspiracy may be inferred:" Commonwealth v. Bartilson, 85 Pa. 482. The evidence relating to the contract, the construction which the defendants put upon it, and the manner in which they dealt with invoices prior to that in question under the contract was properly admitted as tending to establish a system and to show that the act charged in the indictment was but one of a connected series of frauds, intentionally committed, and not attributable to mere negligence or mistake: Neff v. Landis, 110 Pa. 204; Bottomley, Jr., v. United States, 1 Story 135; Wood v. United States, 41 U. S. 342. The very able argument submitted by the learned counsel for the appellant contends that sofas and tables were properly chargeable under item 22 be-

cause, owing to the form in which the schedule was prepared, his bid upon the several items in which the articles were specifically designated and his bid upon item 22 were alternative bids, and the award to him of the contract on all of these bids constituted an alternative contract, under which he had a right, at his election, to charge for all of the articles the higher rate provided for under item 22. The argument further contends that the market value of the sofas covered by the several invoices could not be considered as evidence that the construction of the term "per foot" as meaning square foot of surface would result in an unconscionable contract, for the reason that "Item 25; designed sofas, seating, etc., either upholstered wood, metal or stone, series F, per foot" awarded at $12.90 net per foot, was an average item, for sofas made of different materials; that sofas and seating made of stone would have cost the appellant at least twice as much as wood, and bronze at least four times as much, and that, therefore, the sofas covered by the invoices being of upholstered wood, their market value would be no evidence of what would be a fair average price for sofas of the different kinds specified. Counsel illustrates his argument by showing that an average bid for "gold or metal, by the pound," would necessarily have to be very much higher than a pound of iron was worth. This line of argument seems to make very clear the possibilities for fraud which lurked in the terms employed and the composition of the items in the schedule of 1904–1905. Items 22 and 25 of that schedule present striking illustrations of its peculiarities; the former invited bids to supply a number of articles of widely different nature "of either woodwork, stone, marble, bronze, mosaic, glass and upholstery;" and the latter invited proposals to furnish sofas or seating, "either upholstered wood, metal or stone." Each item provided that the bid should be at a fixed rate "per foot" for all of the articles, without regard to the great difference in value of the material of which the several articles might possibly be made or the work required to manufacture the different articles. Item 25 gave no indication how many sofas were to be of wood or metal or stone. Why was this schedule so prepared? Why in naming a unit of

measurement by which the price of the articles was to be determined did they use a term not known to persons who manufactured and dealt in the articles embraced in the several items, and if there was a reason for the use of this unusual term "per foot" why did they not in the schedule state what kind of a foot was meant? The state must necessarily deal through agents. Many large mercantile establishments employ agents as buyers. Take the case of an agent authorized to make purchases, after advertisement, of the responsible person whose bid is the largest percentage off the maximum price to be fixed by the agent, upon each item of a schedule to be by the agent prepared. If such an agent were to publish a schedule containing an item which read "Cups, of either gold, silver or pewter, per ounce" and fixing a maximum price of $8.00 without specifying the number of cups of gold, silver and pewter, would any sane man take the chances of bidding upon that item until he had obtained inside information from the man who made up the schedule? With regard to the materials mentioned in such an item, it may be assumed that all persons know that gold cannot profitably be sold at $8.00 an ounce, and that the sale of either silver or pewter at the same rate would be extraordinarily advantageous. It would be reasonable to assume that the man who bid twenty-five per cent off upon that item and contracted to furnish "Cups, of either gold, silver or pewter" at $6.00 net per ounce, had an understanding with the agent and that he knew exactly how many cups made from each of the materials he was to furnish under that contract. If after that contract had been executed, the performance completed and the agent had paid for all the goods with the money of his employer, the latter discovered that the agent under the contract upon that item had accepted and paid for 100 pewter cups at $6.00 per ounce, but no cups of gold nor even silver, he might reasonably and logically be justified in drawing the following inferences: (1) That the bidder upon that item knew that he was only to be required to furnish pewter cups; (2) that the item had been prepared and the bid made in pursuance of a combination between his agent and the pretended vendor for the purpose of using the pretended contract as an

instrument for defrauding him; and (3) that his agent had paid to the coconspirator the unconscionable price for pewter cups in pursuance of the corrupt combination, the ultimate purpose of the conspiracy. If the discovery of the fraud were within the period of the statute of limitations after the payment, but after the statute had run computing from the date of the contract, an indictment might properly charge conspiracy as of the date of the payment and the payment of the money as the overt act, and evidence would be admissible as to the character of the contract, the manner in which it was entered into and all that was done under it, for the purpose of sustaining the indictment: Commonwealth v. Bartilson, 85 Pa. 482; United States v. Greene, 115 Fed. Repr. 343. In such a case there can be no doubt that evidence as to the market value of pewter would be admissible and ought to be considered by the jury. That case would in no essential particular differ from the one with which we are now dealing. The schedule for the years 1904–1905 was required by law to be presented for competitive bidding. Many of the items in that schedule were indefinite and we select "item 25" for the reason that it is a fair example, not because the vice in it is more apparent than in many other items. No man would have been safe in submitting a bid upon that item unless he knew whether the sofas which he would be required to furnish were of upholstered wood, or stone or bronze. More especially the meaning of the term "per foot" in the item must have arrested the attention of bidders. Did it, as applied to sofas, mean lineal foot, square foot of surface or cubic foot? The maximum price which the schedule fixed as the limit which the state would pay was $15.00 per foot. Unless the bidder knew whether he was to be· paid for each foot in the length of the sofa, or for each square foot of surface or for each cubic foot which it contained, he could have no true conception of the meaning of any bid which he submitted. He must, in order to bid intelligently, have inside information, as to the construction which was to be put upon the contract. The evidence established that the maximum price fixed by the schedule was certainly below the real value of the sofas if the measurement was to be the number of feet in their length, but if

the contractor was to be paid by the number of square feet in the surface the state would at the maximum price named pay about eight times what the sofas were worth. This taken in connection with the vague language in which the item was drawn was no doubt responsible for the fact that no person other than Sanderson submitted a bid upon this item. Why did he, upon this item, bid fourteen per cent off and agree to furnish sofas at $12.90, net, per foot? What information did he have, as to the meaning of the term "per foot," which was not accessible to other bidders? What ground had he for believing that upon his bid the state's agents, who subsequently became his codefendants, would construe the contract to mean that for a sofa six feet in length he should be entitled to be paid by the state over $1,000? There is no evidence in the case which would have justified a finding that any other bidder would have had any grounds for believing that a like bid by him would have been construed in any such manner. The only evidence of knowledge by Sanderson as to the meaning of the term "per foot," when used in a schedule in connection with the same subject-matter, revealed that he had then understood the term to mean lineal foot. There was no usage of the trade which justified his believing that he would be entitled to be paid by the square foot of surface. It is, however, manifest that he must have known when he submitted his bid that, as to him, the contract would by the agents of the state be construed as entitling him to be paid in some manner other than by the lineal foot. He could have obtained his information from no source but the agents of the state, and with them he must have had an understanding. The item was so worded that no man could bid upon it who did not have such understanding, and this made sure that the man who had the understanding would receive the contract. The action of the state officers in dealing with the various invoices rendered under the contract revealed the construction which they put upon these ambiguous items of the contract, and were sufficient evidence to justify a finding that they intended to so construe the meaning of those ambiguous items when they awarded the contract to Sanderson. A fact that had direct bearing upon the good

faith of all the parties to the transaction was that while the
first twenty items of this schedule, respectively, provided for
the supply of definite articles, such as chairs of various kinds,
couches and tables of sizes specified, at fixed prices for each
article, and Sanderson's bids upon those items were very low,
thus presenting an apparent reason for awarding him the con-
tract for all the items of the schedule, this appellant although he
furnished many of the articles covered by those items did not
present a claim for a single article under any of those items, but
billed them all to the state and they were paid for by the other
defendants, as properly coming within one of the mysterious
items under which furniture of upholstered wood was to be
paid for at so much per foot.  The evidence as to the manner
in which the schedules were prepared, the indefinite language
in which the various items thereof were expressed, the effect
which the parties subsequently gave to the vague provisions
of the contract, and all their actions thereunder, were proper
for the consideration of the jury and sufficient to sustain a find-
ing that the overt act charged in the indictment was part of a
consistent and continuous system of fraud.  When the agents
of the state awarded the contract to Sanderson upon the am-
biguous items, designating the price "per foot" to be paid for
furniture, if it was their intention to pay him for each square
foot of surface, as they subsequently sometimes did, or for
each cubic foot of a receptacle which would contain the article,
as they did in other instances, or if it was their intention to pay
him for three times the length of the article, as they did for
sofas in the invoice upon which the indictment is founded;
then the question of their good faith in the preparation and
advertisement of the schedule and awarding the contract to
Sanderson and the payment of the money of the state accord-
ing to the varying standards of measurement used in the
different invoices must necessarily arise.  In the consideration
of this question it would be manifestly proper to consider the
subject-matter with regard to which they were dealing and the
real value thereof.  When an agent asserts that he has made a
contract on behalf of his principal to buy furniture according to
a standard of measurement which would make the principal

pay $1,007.40 for a sofa, and the written contract is so worded that it might reasonably be construed to mean that less than one-tenth of that price is to be paid for the article, the actual value of the sofa is certainly proper to be taken into consideration in determining the good faith of the agent in making the contract and the construction which he attempts to put upon it, and it would be proper to show that the market value of the sofa was $125. We incline to the opinion that evidence as to the market value of the furniture covered by the several invoices of Sanderson was admissible against all the defendants, and there can be no doubt that it was admissible against Sanderson for the purpose to which it was by the court below limited. The appellant has no just grounds of complaint as to the manner in which the meaning of the term "per foot" was submitted to the jury; nor as to the admission of the testimony with regard to the manner in which the schedule was made up and the contract awarded, nor of the comments of the court upon that evidence.

The ground of complaint in the sixth group into which counsel for appellant divides the specifications of error, in the presentation of the case, is thus stated in the paper-book: "That the court erred in admitting testimony to show that it was not the duty of Huston under his contract as architect with the board of commissioners of public grounds and buildings to certify to the correctness of the bills, and in its charge leaving it open to the jury to determine that the contract did not impose the duty on Huston to certify to the correctness of the bills." We have examined the specifications of error and are convinced that the above statement of the question which they raised is rather broader than the specifications warrant. The commonwealth did not produce, nor offer, evidence tending to establish that it was not the duty of Huston to certify to the correctness of the bills; that is the amount which Sanderson was entitled, from time to time, to be paid by the state on account of the contract. The commonwealth contended consistently all through the case that it was the duty of Huston to examine and certify to the correctness of the bills, and certify truly, but that he had certified falsely, and in support of this contention produced evi-

dence which established to a demonstration that Huston had, with regard to the invoice in question and many others, certified falsely, and that as an agent of the state he had been disloyal, dishonest and corrupt. The question raised by the admission of the evidence complained of and the comment of the court thereon were not whether Huston was bound under his contract with the board to certify generally as an architect to the bills, but related entirely to the extent of his certification and the details to be incorporated in his certificate. The only evidence upon this point of which the admission is by this appellant assigned for error is embraced by the thirty-fourth, thirty-fifth, thirty-seventh, thirty-eighth and fifty-second specifications. The thirty-fourth specification is founded on the admission of the offer of the commonwealth to prove that prior to July, 1905, Huston issued certificates in the ordinary form of an architect's certificate, simply, without setting forth in the certificate itself either item numbers or weights or measurements of the articles mentioned in the invoice to which the certificate was attached; that about July, 1905, Auditor General Snyder requested Huston and his assistant to insert in subsequent architect's certificates the item numbers and weights and measurements of the articles mentioned in the invoice and instructed the witness to copy said item numbers, weights and measurements from the footings of the invoices, stating that he desired such information for the purpose of identifying the architect's certificates with the bills, in order to enable him to check up in his office; the offer was stated to be for the purpose of showing that Auditor General Snyder, one of the defendants, knew that the item numbers, weights and measurements which were subsequently included in the certificates were mere transcripts from the footings of the invoices presented by Sanderson. This evidence was properly admitted for the purpose for which it was offered, and to explain the reason for the change in the form of the certificates. The evidence would certainly be material and relevant in the consideration of the question of the right of Snyder to rely upon the correctness of the "Item numbers," as stated in the certificate of the architect. There were presented, in connection with this testimony, a number of cer-

tificates attached to various invoices, which showed that prior to July 7, 1905, the certificates issued by Huston had simply certified that Sanderson was entitled to the payment of $125,000, or whatever the amount of the invoice might be, on account of his contract with the commonwealth of Pennsylvania, for designed furniture, etc., for the new capitol building at Harrisburg; but after that date the certificates stated the "Item number" of the schedule and the number of feet or pounds, which were in each case exact transcripts of the footings of the invoice to which they referred. This evidence simply showed what the parties had actually done with regard to the certificates, and the appellant has no ground to complain of its admission. The evidence embraced by the thirty-fifth specification of error tended to show that Auditor General Snyder had, about the time the invoice in this case was paid, drawn two warrants in favor of Sanderson, under this contract, and personally taken those two warrants to Philadelphia, before any certificate of the architect had been signed for the invoices upon which the warrants were founded, and that he there procured certificates of the architect for amounts corresponding to the warrants; this was offered for the purpose of showing knowledge upon the part of the auditor general that the certificates of the architect did not purport to be certificates as to the correctness of the invoices, and for the purpose of showing the irregular course of issuing warrants under this contract. This evidence had a direct bearing upon the question whether the defendant Snyder had any reasonable ground to believe that any confidence whatever ought to be placed upon the certificates which Huston issued for the invoices of Sanderson from time to time. The evidence was admitted as against Snyder alone, and its effect was confined to the question of his good faith in asserting reliance upon the certificate of Huston. The thirty-seventh specification is but a repetition of the thirty-fifth specification, refers to the same evidence and does not require additional comment. This appellant withdrew his objection to the admission of the evidence embraced by the thirty-eighth specification of error, and there is no exception to sustain that specification. The fifty-second specification relates to testimony as to what

this appellant did with regard to the very certificate of the architect which was attached to the invoice, the payment of which is the overt act charged in this indictment. The certificate in question was the one which contained the item number, the number of feet and the price, these being copied from the footings of the invoice, and it was attached to the invoice charged to be false and fraudulent. It was certainly competent to show what the parties charged in the indictment had done with that certificate. The evidence tended to establish that at the time that certificate was dated, March 30, 1906, Huston had for some time been in Europe; that prior to his departure he had signed his name, as architect, to a number of blank certificates, intending that the same should be filled up during his absence and used as certificates certifying to the correctness of invoices about which he knew nothing; that on March 30, 1906, Sanderson went to the office of Huston, presented the invoice in question, with his affidavit attached, and had one of the clerks fill in the blanks in one of the certificates which Huston had signed, certifying that Sanderson was entitled to payment of $53,318.60 and transcribing into the certificate the footings of the invoice, "Item 24, 2897¾ feet at $20.00, less eight per cent, = $18.40, total $53,318.60." Sanderson assured the clerk, the witness, that it would be all right, that the articles would be checked up by the superintendent of public grounds and buildings and the auditor general. Sanderson then took this certificate with him, and the witness identified it as that attached to the alleged fraudulent invoice. If this testimony was true it established that Huston had so prepared certificates that Sanderson might during his absence make use of them; that Sanderson did actually make use of the certificate for the purpose of making it appear that he was entitled to this large sum of money and that the architect in charge certified to facts of which he, as Sanderson positively knew, had no knowledge. This evidence was admissible against this appellant and to him its effect was by the court below confined. The appellant has no valid ground of complaint as to the instructions of the court in its charge relating to the evidence with regard to the manner in which it was the duty of Huston to certify. Had the indictment included

only the defendants who went to trial, and not Huston, and had
it averred that it was the duty of Huston to certify the bills and
the duty of the state officers to pay them according to that cer-
tification, and charged that the defendants had conspired to de-
fraud the commonwealth by paying larger sums than Huston
had certified, such indictment would make the facts of the duty
of Huston to certify and the duty of the defendants to pay ac-
cording to that certification material elements of the crime
charged.   In such a case the indictment would not be sustained
by evidence that it was not the duty of Huston to certify and
that he had not in fact certified, nor would it be sustained by
evidence that Huston had certified falsely and the other de-
fendants had paid in obedience to such false certification.   But
that is not this indictment.   The charge here, against all the de-
fendants, was that they had conspired to "cheat and defraud
the Commonwealth of Pennsylvania and the people thereof by
means of divers false pretenses of its and their moneys, goods,
chattels and property, to wit, the sum of $19,308.40, . . . . by
means of a certain false and fraudulent claim, invoice or bill on
account of the said contract of the said John H. Sanderson with
the said Commonwealth of Pennsylvania, and by means of cer-
tain false, fraudulent and collusive certificates to said claim,
invoice or bill on account of said contract."   In the portion of
the indictment descriptive of the defendants, their respective
offices and duties, and in the charging portion of it it is averred
that Huston, being then and there the architect and agent em-
ployed and appointed as aforesaid "and being then and there
charged under his said employment with the duty of examining
and certifying to the correctness of all bills rendered by the said
John H. Sanderson to the said Commonwealth of Pennsylvania
for all articles and materials furnished or labor performed to or
for the said Commonwealth of Pennsylvania under and on ac-
count of said contract conspired with the other defendants," etc.
The averment of the duty of Huston was necessary in order that
his connection with the transaction might be made to appear.
If Huston had been on trial it might have been necessary, in or-
der to secure his conviction, for the commonwealth to prove that
it was his duty to certify; it would have certainly been incum-

bent upon the commonwealth to prove that he had in fact certified, but he was not on trial. The duties which in the inducement portion of the indictment are averred to have been upon the defendants, respectively, who went to trial, and which are recited in the description of the defendants in the charging part of the indictment, are not by the indictment averred to have been dependent upon the discharge of any duty by Huston. Owing to the manner in which the case went to trial the commonwealth was not required to prove that there was any duty owing by Huston, nor that there was such a person as Huston. The argument that the introduction of the evidence with regard to the manner in which it was the duty of Huston to certify resulted in a variance between the allegata of the commonwealth and the probata and thus violated the constitutional requirement that the accused in a criminal case shall be informed of the nature and cause of the accusation against him, is without foundation. The commonwealth is not required to prove, in a criminal case, that all of the defendants charged are guilty, although in the case of conspiracy it must prove that two or more are guilty.

The complaint, in the fifty-sixth specification, that the charge of the court to the jury was inadequate and misleading, in that greater prominence and comment was given and made upon the evidence submitted by the commonwealth than upon that submitted by the defendant, cannot be sustained. The evidence was so voluminous that the court could not reasonably be expected to comment on all its details, but in so far as it did review the evidence, the contentions of the defendants and the evidence in support thereof were impartially presented; and at the conclusion of the charge counsel were asked whether they had anything to suggest which the court had omitted and which they thought necessary to be brought to the attention of the jury, and the attention of the court was then called to one particular piece of evidence which the court instructed the jury to take into consideration. The case, as disclosed by the record, was by the learned judge of the court below ably and impartially tried and we find no reason for disturbing the judgment.

The judgment is affirmed.